E-FILED
Friday, 02 February, 2007  03:31:17 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| MARLON JOYNER, COREY MANN, FREDERICK MORRIS, ORLANDO OWENS, THOMAS FREEMAN, CONNELL GRAY, DAVID ROBINSON, BRUCE TURNER, and RICKY WHITE, | ) ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| ARCHER-DANIELS-MIDLAND COMPANY, | ) |
| | ) |
| Defendant. | ) |

Case No. 03-CV-2177

## OPINION

This case is before the court for ruling on the Motions for Summary Judgment (#86, #88, #90, #92, #94, #96, #98, #100, #102) filed by Defendant, Archer-Daniels-Midland Company (ADM). Following this court's careful and thorough consideration of the arguments of the parties and the documents provided by the parties, ADM's Motions for Summary Judgment are GRANTED.

## FACTS[1]

All of the Plaintiffs are African American males who are employed by ADM or were formerly employed by ADM. It is undisputed that, at all relevant times, ADM had an anti-discrimination and anti-harassment policy that was posted at the various locations where Plaintiffs were employed. The postings provided telephone numbers for employees to call and report harassment or discrimination. ADM also had a "Compliance Help Line" that employees could

---

[1] The statement of facts in this case is based upon ADM's Statements of Undisputed Material Facts, Plaintiffs' Responses and Statements of Additional Material Facts, ADM's Replies, and the voluminous documents submitted by the parties. This court has only included facts that are properly supported in the record, and has omitted many facts which are based solely on subjective beliefs and speculation. This court has also only included facts which are actually material to Plaintiffs' claims. This court notes that Plaintiffs have stated in their Responses to the Motions for Summary Judgment that they are no longer pursuing some of the claims they included in their charges of discrimination and their Amended Complaint. Therefore, this court has not included facts unless they are material to claims Plaintiffs are still pursuing.

utilize to report harassment or discrimination. The record shows that Plaintiffs were aware of ADM's anti-discrimination policy. The remaining facts will be organized by Plaintiff and work location.

## I. WEST PACKAGING PLANT

### A. MARLON JOYNER

Plaintiff Marlon Joyner was hired by ADM on July 6, 1998, and worked at ADM's Packaging Plant, which is part of ADM's "West Plant" in Decatur, Illinois. Joyner was hired as a laborer and was promoted to a production worker position on September 18, 1998. Joyner held a production worker position until he voluntarily resigned his employment in July 2004 to relocate to the Atlanta, Georgia area. During his employment at ADM, Joyner was a member of a union and his employment was covered by a collective bargaining agreement. For at least the last four years of his employment, Joyner worked on the "Sidel" machine. This position was considered a "step up" production worker position and, under the terms of the collective bargaining agreement, Joyner was paid 60 cents more per hour than employees who held regular production worker positions. Joyner has acknowledged that he could have bid on and obtained, on the basis of seniority, numerous operator positions, which would have resulted in higher pay. Joyner was not interested in any of the open operator positions.

Paul Smith, an African American employee, was promoted to shift supervisor in late 2001 and became Joyner's supervisor. Joyner testified that, in early 2002, he told Smith that he was interested in a "lead man" position. A lead man is a union employee who fills in for a full-time shift supervisor when a supervisor is absent. The union employee is paid a higher hourly rate when

2

acting as a lead man.[2]  Lead man positions were not posted, but the testimony showed that employees were required to let management know they were interested in a lead man position in order to be considered for the position.  For example, Smith testified that he informed the plant manager when he began his employment at ADM in 1998 that he was interested in becoming a supervisor.  Smith testified that he "constantly made an effort to let them know that I was interested in being a supervisor."  Smith became a lead man in April 2001 prior to being promoted to shift supervisor.  At the time Joyner told Smith he was interested in a lead man position, Smith told him that no lead man positions were available.  According to Joyner, Mark Dunham, a white male, was subsequently made a lead man.  In addition, Doug Dukeman, another white male, was not formally made a lead man but was assigned to fill in as a supervisor on multiple occasions and received higher pay when working as a supervisor.  Joyner claims that he was discriminated against when he was not chosen for a lead man position.  In addition, Joyner claims that he was denied shift supervisor positions because ADM chose white employees for its lead man positions and then promoted employees already in the lead man position to any open supervisor positions.

Joyner also claims that he was subjected to a hostile work environment based upon his race during his employment at ADM.  Joyner testified that he and other African American employees were yelled at for talking and told to get back to work when white employees were not reprimanded for talking.  Joyner testified regarding numerous incidents that he heard about where ADM employees made racially offensive remarks.  Joyner acknowledged, however, that he was not present when these remarks were made and that only one of the remarks was directed toward him.  Joyner

---

[2]  In the documents submitted by the parties and the parties' arguments, this position has been referred to as "lead man" and as "step up supervisor."  In order to avoid confusion with the "step up" production worker position, this court will refer to this position as "lead man."

testified that Bonnie Scoggins told him that Rocky Daniels called Joyner and Plaintiff Corey Mann "worthless niggers."   Joyner does not claim that he reported any of this conduct to ADM management.  Joyner also testified that there was racist graffiti at the West Plant.  One of the incidents Joyner relied upon was an incident where ADM employee Glen Peck wrote racist graffiti on an ADM building.  Joyner does not dispute that ADM fired Peck for this action.  Joyner testified that there were other occasions where he saw racist graffiti.  Joyner testified that he complained to his union representative about the graffiti but does not claim that he reported any of the graffiti to ADM management.  Joyner testified that he nevertheless felt that ADM should have done more in response to the graffiti, stating "[t]hey could have addressed us and let us know that action had been taken and that they were going to try and prevent it in the future."

### B.  COREY MANN

Plaintiff Corey Mann also worked at the Packaging Plant at ADM's West Plant in Decatur. Mann was hired on July 21, 1997, as a laborer and, like Joyner, was a member of the union.  Mann was awarded a production worker position in October 1997.  Several years after he started working for ADM, Mann informed his supervisor, Rocky Daniels, that he wanted to move to the shipping department.  Within two weeks, Daniels helped Mann move to the shipping department.  Mann held a production worker position at ADM until he voluntarily resigned on May 24, 2005.  It is undisputed that Mann had a long disciplinary history at ADM.  Mann does not dispute that he was disciplined by ADM on 10 separate occasions between April 9, 2001, and May 13, 2004.  On May 14, 2003, ADM suspended Mann for 11 days for sexually harassing a female ADM employee while ignoring his job-related duties.  Mann admitted that he asked the female employee, who was working as a guard, if she "liked black men" and if she "date[d] black guys."  Mann also admitted

that he spent at least 15 minutes engaging in that conversation while he was "on the clock" and supposed to be working. Mann, however, testified that he did not make any sexual overtures to the female employee and contends that the discipline imposed was undeserved and racially discriminatory.

Mann testified that he asked to be trained on various machines while employed at ADM as a production worker but was not provided the requested training. On January 16, 2003, Mann told Erik Lightner, who was the plant manager at that time, that he was interested in a lead man or shift supervisor position. However, Lightner had already selected Brad Mullen for an open shift supervisor position. Lightner selected Mullen for the shift supervisor position based upon Mullen's overall qualifications. Lightner stated that Mullen had been passed up in filling several prior shift supervisor openings. Mann testified that he was discriminated against when he was not selected for lead man positions given to other employees, including a position given to Mullen in 2000 or 2001. However, Mann admitted at his deposition that he had not expressed interest to ADM in being made a lead man prior to learning that Mullen had been selected for the position. Mann also admitted that he was not as qualified as Chad Bartosik at the time that Bartosik was selected for a lead man position.

Similar to Joyner, Mann testified that he did not bid on numerous operator positions he would have been awarded based upon seniority because he did not want to work as an operator. Mann testified, however, that he did bid on an open operator position for the first time in April 2004. Mann was awarded the operator position. Mann trained for the position for approximately 10 weeks and took a qualifying test on two occasions and failed both times. Mann admitted at his deposition that he made major errors while training in that operator position. Mann testified that this series of

events represented race discrimination.  He testified that he did not receive adequate training and that white employees made similar mistakes but were not adversely affected.  Mann also testified that a white employee, Alan Engdale, "didn't necessarily pass the test, but they let him pass the test in order to give him the job."  It is undisputed that Mann does not have any evidence that Engdale did not legitimately pass the operator test.  ADM presented evidence that Engdale was required to take, and pass, the operator test.

Mann testified that he was subjected to a racially hostile work environment during his employment at ADM.  However, it is undisputed that, during Mann's entire eight-year period of employment at ADM, never once did anyone utter or direct any type of racially charged comment, racial epithet or racial slur toward Mann.  Mann testified that, in 2002, Glen Peck wrote "We hate niggers" on a door at ADM.  However, as previously discussed, Peck was fired after ADM investigated the incident.  Mann also testified regarding a racial joke made by ADM employee Mike Espy.  It is undisputed that Mann was not present at the time Espy made the joke and it is also undisputed that Espy was disciplined for this incident.  Mann also testified regarding an incident in 2003 where ADM employee Bill Hauck allegedly made the comment, "Fuck that Nigger" in reference to someone other than Mann.  This comment was not made in Mann's presence, but Mann heard about it from another employee.  It is undisputed that Hauck was suspended for five days following this incident; however, the discipline was imposed for a variety of conduct by Hauck, not just the racially offensive comment.

Mann also testified that he saw racially offensive graffiti on trailers delivering goods to ADM in 2001 or 2002.  Mann testified that he reported this graffiti several times to his supervisor, Dennis Miller.  Mann testified that Miller took photographs of the graffiti and called the trucking

6

company.  Mann also testified that tape was put over the graffiti.  In addition, Mann testified that

his supervisor Rick Blankenship consistently harassed him and singled him out for menial tasks.

However, Mann admitted that, on the lone occasion where he complained to ADM management

about Blankenship, ADM's then plant manager, Ashwin Patel, "had a talk" with Blankenship and,

as a result, Blankenship "backed off" of Mann and Mann never again had similar issues with

Blankenship.  Mann also testified that ADM supervisor Dennis Miller told Brian Van Scyoc to stop

"hanging around" with Mann.  Mann stated that it was supervisor Phil Judd who told Miller to talk

to Van Scyoc about "hang[ing] out" with Mann.  Mann testified that he had problems with Smith

after Smith became his supervisor in 2003.  Mann testified that Smith had a "personal grudge"

against him.  Mann testified that he believed that Smith's conduct was based on race discrimination,

even though Smith is African American, because Smith wanted to be part of the company and was

willing to do whatever it took, including discriminating against Mann, to maintain his position.

## C.  ORLANDO OWENS

Plaintiff Orlando Owens was hired by ADM on September 22, 1997.  Owens originally

worked at ADM's Bio-Products facility in Decatur as a laborer.  He advanced to a utility position

on March 30, 1998.  Owens moved to the West Packaging Plant in August 2000 because he had a

medical condition which prevented him from working the swing shifts used at the Bio-Products

facility.  Owens bid up to a production worker position in February 2001.  During his time at the

West Packaging Plant, Owens has chosen to forego higher paying operator positions in the West

Complex in order to stay in the Packaging Plant.  Owens is still employed at ADM.

In 1999, while he was working at the Bio-Products facility, Owens received training for a

lysine UF position, which is an operator 2 position.  It is undisputed that Owens had to be qualified

7

for the position before he could move into an operator 2 position.  After he had been training for some period, Owens was asked questions about the lysine UF position that he was unable to answer and was not allowed to complete the training.  Owens testified that he told management that he did not want to train for the position anymore.  It is undisputed that, without completing the training, he could not become a lysine UF operator.  Owens testified at his deposition that his training was inadequate and that white employees were given help to answer questions during their training.  However, Owens testified that he observed only portions of the tests given to other employees.  Owens testified that he subsequently asked to be trained for the lysine UF position and was denied training.  However, Owens did not know if any positions were open at that time and could not identify any lysine UF positions that were filled in Bio-Products before he moved to the West Plant.  In fact, the plant superintendent, Timothy Aydt, stated in his affidavit that there was no need to train anyone at that time.

Owens also testified that he was discriminated against when he was denied a step-up production worker position at the West Packaging Plant.  Specifically, Owens testified that he requested a position running a filler on the retail line in February 2001.  Owens testified that this position was given to Greg Simpson, a white male employee.  Owens testified, however, that Simpson had previous experience working in the retail area as a production worker.  Owens testified that he was given a forklift position and had previous forklift experience.  Moreover, Owens acknowledged that several African American employees, including Joyner, regularly worked in step-up production worker positions and that a number of white employees did not work in step-up positions and did not receive the extra pay.

In addition, Owens testified that he was denied a lead man position at the Packaging Plant.

8

He testified that, in the spring of 2001, he spoke to Jacob Stolzfus, a production assistant, about a lead man position.  Owens also testified that he spoke to Erik Lightner when Lightner was plant manager about a shift supervisor position.  Owens testified that he spoke to Lightner before early 2003 and that Lightner informed him there were no openings at that time.  Lightner was plant manager of the Packaging Plant from February 2001 to February 2003 and stated in his affidavit that he promoted four employees to a shift supervisor position while he was plant manager.  He promoted Paul Smith, John Byler, John Goodwin, and Brad Mullen.  Lightner testified that he did not receive any information that Owens was interested in a shift supervisor position prior to promoting Smith, Byler, Goodwin and Mullen based upon their qualifications.  Lightner did not promote anyone to shift supervisor after Mullen was given the position.  Owens testified that he may have spoken to Lightner about a shift supervisor position after Mullen was selected for the position.  Owens testified that Lightner posted a notice regarding supervisory positions in May 2002.  Owens testified that he saw the posting but did not express interest in a supervisory position at that time.

Owens also claims that he was subjected to a racially hostile work environment while he was employed at ADM.  Owens testified that he had an accident on a forklift and was taken off the forklift position and reassigned to a depalletizer position in October 2001.  It is undisputed that Owens did not receive any disciplinary action related to the forklift accident and that Owens had the same rate of pay and same hours after he was reassigned to a depalletizer position.  Owens also testified that, in 2001 or 2002, he was told by his supervisor that he would no longer be working with Jason Partee, another African American employee, because they talked too much.  In addition, Owens testified that he was disciplined for mistakes and that white employees were not disciplined for similar conduct.  Specifically, Owens relied on two situations where he was issued a verbal

warning.  The first disciplinary action occurred on August 7, 2003, based on the fact that Owens placed the wrong labels on bottles while working as a labeler.  Owens acknowledged that he did, in fact, put the wrong labels on bottles.  He testified that white employees had also put the wrong labels on bottles and were not disciplined.  However, Owens was not aware of all the circumstances of the other incidents.  Owens acknowledged that he did the same thing on a previous occasion and was not disciplined.  The second disciplinary action occurred on September 26, 2003.  Owens received a verbal warning for running product without checking the customer profile.  Owens admitted that he did, in fact, run the oil without its profile.  In addition, it is undisputed that Owens could not identify anyone who had made the same error and had not been disciplined.  Owens testified that, in the spring of 2005, he was harassed by his supervisor, Rocky Daniels.  The harassment consisted of constant supervision and "smart comments."  Owens testified that he believed Daniels' actions were based on race because he saw confederate flag seat covers in Daniels' truck.

Owens also testified that he overheard an employee, Shane Hadley, make offensive racial remarks while he was working at Bio-Products.  It is undisputed that these comments were not directed toward Owens and it is also undisputed that Owens did not report any of the comments to ADM management.  Owens testified regarding other inappropriate racial remarks made by ADM employees, including a supervisor in the maintenance department.  It is undisputed that Owens did not report any of these remarks to ADM management either.  Owens testified that he was also aware of three employees at the West Packaging Plant, including Hauck, who made inappropriate racial remarks in the workplace.  It is undisputed, however, that no one made any racial comments to Owens at the West Packaging Plant and that Owens never even overheard any racial comments.

Owens testified that he was told that Espy used the term "niggers."  Owens testified that the incident

involving Espy was not reported to ADM management because the union wanted to handle it on its

own.  Owens also testified that Joyner told him about a racist comment made by Ralph Kramer.  It

is undisputed that Owens did not report any of the inappropriate racial remarks he heard about at the

West Packaging Plant to ADM management.  Also, as previously discussed, Hauck was disciplined

after he made a racial comment.

Owens also testified about racially offensive graffiti that he observed.  He testified that, in

late 1999 or in 2000, he reported racial graffiti to his supervisor, Scott Jesse.  Jesse gave him some

cleaner and told him to remove the graffiti.  Owens did not report any of the other graffiti that he

saw.  Owens testified that the graffiti he saw at Bio-Products did not affect his job performance.

Owens testified that there was some graffiti at the West Plant.  He testified that, on one occasion

where he saw graffiti in the men's room, ADM "took that off pretty quick" and that ADM got other

graffiti at the West Plant "off pretty quick."  Owens testified that graffiti at the Packaging Plant was

addressed promptly and that he "would say for the most part, they got the point across that that

wasn't going to be happening over there."

## II.  PEORIA CORN PLANT - FREDERICK MORRIS

Plaintiff Frederick Morris has worked at ADM's Peoria Corn Processing Plant since

September 26, 1996.  Morris is the only Plaintiff who works at the Peoria facility.  Peoria Corn is

a unionized facility, and Morris is a member of the union and covered by a collective bargaining

agreement.  Morris began his employment as a laborer, advanced to a utility operator position, and

moved up to an operator 2 position.  In April 2005, Morris was promoted to an operator 1 position.

Morris is currently employed by ADM as an operator 1.

11

Morris testified that, in 2000, he stepped in acid and injured his foot and was not given adequate time off by ADM.  However, he testified that the "company doctor" gave him a note saying he needed either one or two days off work, and he was provided that much time off.  Morris testified that he disagreed with the company doctor about the amount of time he needed to be off to allow his foot to heal but was not positive that he provided ADM with a note from a different doctor which stated that he needed additional time off.  Morris also testified that ADM has denied him overtime because of his race.

Morris testified that, in 2001, he was not promoted to an operator 1 position based upon his race.  In April 2001, Danny Cunningham was promoted to an operator 1 position that Morris had also applied for.  At that time, promotion to an operator 1 position at Peoria Corn was based upon seniority.  Morris admitted that Cunningham had more seniority than he did.  In October 2001, two operator 1 positions were filled at Peoria Corn using a point system rather than seniority.  Michael Brown, an African American employee, received the first operator 1 position awarded under the point system.  Eight operator 2's were considered for this position.  The top three scorers on the point system were Howard Person, Jr., Michael Brown, and Howard Person, Sr., all of whom are African American.  Morris scored seventh out of the eight considered.  The position was offered to Howard Person, Jr., but he declined the position in order to accept a position in maintenance.  Brown was then promoted.  The second time the point system was used, John Boo, a white employee, was promoted.  Morris had a lower score on the point system than Boo.  Morris had more seniority than Boo, however, it is undisputed that Morris was not the most senior operator 2 when the point system was used so it is uncertain whether he would have been offered the position even if the decision had been based on seniority.  ADM stopped using the point system in November 2001 and went back

12

to awarding operator 1 positions based upon seniority because the union objected to the point system.

Morris claimed that he was discriminated against when he was denied a position in the lab in 2002. Lab positions are outside of the collective bargaining unit and are not covered by the labor agreement. Mike Jurick had worked in the lab department and quit. When the position at issue became available, Morris expressed interest in the position. The position remained vacant for at least one month before it was filled. ADM then selected Jurick for the position because it needed someone who could learn the position quickly. Morris testified that he could have been timely trained in the position if ADM had selected him early in the process.

Morris also testified that he signed up to be considered for a maintenance training grade position that was posted on May 29, 2002. At that time, Ken McFarland was the Maintenance Superintendent at Peoria Corn. Interested candidates for entry level positions in the maintenance department were evaluated in three areas: (1) prior experience; (2) performance on a hands-on test; and (3) performance on a battery of standardized tests. Each of the three areas was given equal weight on a 100 point scale. In evaluating prior experience, experience prior to joining ADM and job performance at ADM were considered. Experience prior to joining ADM was determined based upon a personal interview. McFarland, along with Maintenance Supervisor Ken Geary, conducted the interviews and interviewed Morris. Morris has a bachelor's degree and master's degree, both in criminal justice. Morris has never taken any vocational courses. Morris' work experience prior to joining ADM included working at a restaurant, working at Wal-Mart, working for a football coach, working for his uncle at an automotive shop from January to May 1994, working as a field hand and working on houses on his own. Following the interview, McFarland credited Morris with

five months of experience based on what he believed to be Morris' moderate experience in automotive work and home repair. Morris believed he should have been given more credit for his experience. In addition, Morris was assessed points for his experience working at ADM. Morris testified that his supervisor, Don Wells, unfairly gave him low scores on this portion of the evaluation. Morris took the hands-on test and received a total of 25.5 out of 100 points. Morris also took the written test and scored "above average" in the areas of work habits and work interests. However, Morris scored below average in the area of technical ability and received a total score of 58.33 on the written test. When Morris' overall score based upon all three components was calculated, he had the lowest score of the 11 employees who applied for the maintenance position. The three available positions were given to the three employees who had the highest overall scores.

Morris also testified that he was discriminated against when Mark Diekoff was given an operator 1 position in 2003. It is undisputed that Diekoff had held the operator 1 position and left to go to maintenance. Diekoff decided not to pursue the maintenance training and returned to his former operator 1 position. Morris testified that he was discriminated against because, if he had been given the opportunity to work in this operator 1 position during the time Diekoff was pursuing maintenance training, he could have moved back into the position if the position became available again. In its Reply, ADM presented evidence that Diekoff was out of the position for one week and Morris was not the most senior operator 2 at the time and would not have received the position even if Diekoff had been replaced.

Morris, like the other Plaintiffs, also claims that he was subjected to a racially hostile work environment. Morris testified that he saw racial graffiti in a bathroom three or four times during his employment at ADM, but has not seen any since July 2002. Morris testified that each time the

14

graffiti was reported to management, ADM removed it. Morris testified, "Yeah, they take care of it. They don't leave it." Morris also testified about a racially offensive remark made by another employee at Peoria Corn in 1999. Morris testified that he did not report the remark. Morris testified that he was called "college boy" a couple of times. Morris testified that this was a racial comment although he admitted that the comments were made in the context of mistakes he had made even though he had a college degree. Morris testified that he went to Human Resources about the comments and they stopped. Morris also testified that a supervisor, Don Wells, sometimes used profanity when Wells got upset with him. Morris testified that he reported Wells' conduct and Wells has not used profanity when talking with Morris since July 2003.

Morris also testified that he was disciplined for mistakes that, in his opinion, would not have resulted in discipline for other employees.[3] Morris admitted he did not know all of the circumstances regarding incidents where other employees were not disciplined and that, in fact, some of the employees not disciplined were African American. One incident relied upon by Morris was a situation where his supervisor, Dan Bailey, yelled at him, cursed at him and pointed a finger in his face. Bailey also wrote him up for insubordination. Morris testified that this incident occurred in December 2001. Morris testified that Bailey used profanity, but did not use any racially inappropriate language. Morris complained about the way Bailey treated him. ADM referred Bailey to the Employee Assistance Program for yelling at Morris. ADM had received complaints from other employees, including white employees, that Bailey yelled at and acted harshly toward them.

---

[3] In his response to ADM's Motion for Summary Judgment, Morris discusses an incident where he was suspended without pay in December 2003. This court agrees with ADM that this incident is immaterial to Morris' claims because he never identified this disciplinary action as being discriminatory in his answers to interrogatories or depositions. Moreover, this court agrees with ADM that the circumstances of the incident do not support any claim of race discrimination.

Morris admitted that he had heard Bailey yell at white employees.  ADM counseled Bailey, but after he failed to improve his treatment of ADM employees, ADM terminated his employment in May 2002.

### III.  DECATUR CORN PROCESSING PLANT

### A.  THOMAS FREEMAN

Plaintiff Thomas Freeman has worked at the ADM Corn Processing Plant in Decatur since January 9, 1989.  The Decatur Corn Processing Plant is a unionized facility and its employees, including Freeman, are represented by a union and covered by a collective bargaining agreement. Operator positions are awarded on the basis of Department seniority and qualifications.  Freeman was placed in an operator 2 position in October 1990 and was awarded an operator 1 position in 1992.  It is undisputed that Freeman has never worked outside the Mill Department at the Corn Processing Plant and has no supervisory experience.

Freeman testified that, in 2002, Brian Dickey, a white male employee, became a temporary shift supervisor, which is an hourly position where the employee "fills in" for a foreman.  Freeman testified that he has more seniority than Dickey.  Freeman testified that he spoke with Vincent Joyner about his interest in a foreman position.  Vincent Joyner, who is African American, has been the Human Resource Manager at the Corn Processing Plant since March 2001.[4]  Freeman presented no evidence that he ever told Vincent or anyone else that he was interested in a temporary shift supervisor position.  Vincent testified that Freeman never expressed interest in a temporary supervisor position. Freeman also admitted that he is not contending that he was discouraged from seeking a temporary shift supervisor position.  Freeman specifically testified that he believed it was

---

[4]  Vincent Joyner is Plaintiff Marlon Joyner's cousin.  To avoid confusion, he will be referred to as "Vincent."

racially discriminatory that he was not selected for a position he never expressed any interest in because he "wasn't asked."

Freeman also claimed that he was subjected to a racially hostile work environment. Freeman testified that he was harassed by Wilbur "Bud" Felton. Felton was the Mill superintendent between 1996 and July 2002. In August 2002, Roger Edgecombe became Mill superintendent. It is undisputed that Freeman has had no problems with Edgecombe. Freeman testified that Felton required him to perform menial tasks more often than white employees and also testified that he was singled out for harassment for out-of-spec products even though the error in the product may have been caused by other operators.

Freeman testified that, in approximately May 2002, Felton placed clear safety glasses on Freeman's console and told him that he did not want him to wear shaded safety glasses. Freeman admitted that it is ADM policy to require all employees to wear clear safety glasses. The only exception is Plaintiff David Robinson, Freeman's African American co-worker, who is allowed to wear tinted safety glasses for medical reasons. Freeman also testified that, in approximately June 2002, Felton told Freeman and Robinson to "go back out and go back to work" after they came into the control room to rest. Freeman and Robinson did not follow Felton's instructions but went to see Vincent in Human Resources and complained that Felton was harassing them. It is undisputed that Freeman was not disciplined for not performing the task when requested and that, as a result of his concerns, Plant Manager Bill Manley spoke to Felton and discussed issues regarding employee treatment. In August 2002, Felton was moved out of the Mill Superintendent position and Freeman did not have any more problems with Felton.[5]

---

[5] The reason Felton was moved out of the position did not relate to Freeman's complaints about him.

17

Freeman also testified about racial slurs written on bathroom walls in 2000 or 2001. Freeman testified that Ed Taylor, an African American co-worker, reported the graffiti to ADM. It is undisputed that, after Taylor notified ADM of the graffiti, ADM posted a sign stating that anyone caught writing racist graffiti would be terminated immediately. The existing graffiti was removed, and Freeman testified in 2004 that he had not seen any graffiti in the restrooms or anywhere else on ADM property in years. Steve Merritt has been the plant superintendent of the Decatur Corn Processing Plant since January 1995. Merritt stated that, in November 1999, he received a report from Taylor that employees had observed graffiti of a racial nature in an employee restroom and a restroom used by contractors. Merritt stated that the graffiti was removed and signs were posted to notify all persons using the restroom facilities that any individual caught writing racist graffiti could be immediately terminated. Merritt stated that, subsequently, the existing walls of the individual restroom stalls were removed and replaced with stainless steel walls which were more difficult to deface. At his deposition on April 13, 2006, Freeman testified that, in the week prior to his deposition, he had seen graffiti in the contractor's restroom which included a drawing of a confederate flag. The graffiti was reported by Plaintiff Ricky White. After it was reported, this graffiti was obliterated and ADM ordered additional signage to place in stalls stating that graffiti will not be tolerated.

Freeman also testified about two inappropriate racial comments made by co-workers he heard while employed at ADM. It is undisputed that Freeman did not report either comment to ADM management. This was even though Freeman admitted that Vincent had an open door policy and he knew he could go to Vincent about problems and felt comfortable doing so.

B.  DAVID ROBINSON

18

Plaintiff David Robinson has worked at the Corn Processing Plant since September 23, 1996. Robinson is represented by a union and his employment is covered by a collective bargaining agreement. Robinson is still employed at ADM and has worked the entire time in the Mill Department. Robinson was awarded an operator 2 position in November 1997. Robinson testified that he was aware that he could address employment concerns to Vincent in Human resources and testified that he knew it was Vincent's "job for us to bring our complaints to him."

Robinson has withdrawn his claim that he was denied promotions on the basis of his race. Robinson does claim that he was denied training for an operator 1 position in 2005 based on his race. He testified that a white employee, Eric Waltrous, was given the training for the position and he was denied the opportunity to be trained for the position. However, he testified that he never went to Edgecombe and asked for training. In his affidavit, Edgecombe stated that, in October 2005, the person in the operator 1 position working on the gluten dryers developed a serious illness and began a temporary medical leave of absence. Edgecombe stated that he needed to determine the best and most efficient way to temporarily cover this operator 1 position. Edgecombe stated that he chose Waltrous to cover the temporary position because Waltrous was new to the Mill department so that using Waltrous did not require him to train someone to cover Waltrous' position. Edgecombe further stated that Waltrous did not gain any future advantage as far as securing a permanent operator 1 position because he lacked seniority to be considered for any such position.

Robinson also testified that he was subjected to discriminatory discipline on February 17, 2004. Robinson testified that he received a warning after he failed to depressurize the caustic lines which caused a strain on the system. Robinson testified that "someone got burnt" because one of the filters leaked when the caustic dripped through. It is undisputed that running the caustic line was

an ordinary part of the duties and responsibilities Robinson had as an operator 2. Robinson admitted that he was trained on the proper procedure and that he saw the other employee's burns the next day. Robinson testified that the disciplinary action was discriminatory because he had to sign an acknowledgment stating he was trained on the caustic procedure. Robinson testified that white employees were not required to sign the acknowledgment and this was the basis for his receiving a higher level of discipline. Robinson also testified that, four months after he received his warning, "somebody" got burned by caustic and that "[t]o his knowledge," no one received a warning. However, Robinson admitted he did not know all of the facts and circumstances regarding this incident, which occurred in the refinery, a different area of the Corn Processing Plant. Also, it is undisputed that Robinson did not lose any pay or suffer any employment consequences as a result of the warning he received in 2004.

Robinson also claims that he has been subjected to a racially hostile work environment during his employment at ADM. In support of this claim, Robinson testified that Felton constantly harassed him when Felton was the Mill superintendent. Robinson testified about the incident regarding clear safety glasses involving Felton and his co-worker Freeman. Robinson testified that, in May 2002, Felton placed a pair of clear safety glasses on Robinson's console and told Robinson and Freeman that they needed to wear clear safety glasses. It appears that, up to that time, employees, including white employees, had been allowed to wear tinted safety glasses. However, it is undisputed that, at the time Felton spoke to Robinson and Freeman about it, they were the only employees in the control room wearing tinted safety glasses. It is also undisputed that, after this incident, all employees except for Robinson have been required to wear clear safety glasses. Robinson told Felton that he needed to wear shaded safety glasses because he had just seen the

20

doctor and he had problems with his eyes.  Robinson testified that Felton accused him of insubordination.  Robinson and Felton spoke to Vincent about it, and Vincent requested written medical documentation from Robinson.  The matter was resolved the next day after Robinson submitted written certification from his doctor.  It is undisputed that, from that time forward, ADM permitted Robinson to wear tinted safety glasses as an exception to the plant policy.  However, Robinson testified that, after this incident, Felton stared at him and tried to intimidate him. Robinson testified that he was not intimidated by Felton and that Felton's staring "didn't bother me." Robinson also testified that Felton did not prevent him from doing his job.

Robinson testified regarding the incident where he and Freeman were told to go back to work after they came into the control room to rest.  Robinson testified that white employees were sitting and relaxing in the control room at that time.  Robinson testified consistent with Freeman's testimony that they went to see Vincent instead of returning to work.  Robinson testified that he was never disciplined regarding this incident.  Robinson testified that he did not return to work the next day due to a personal illness and was off work for eight or nine days.  By the time Robinson returned to work, Felton had been replaced by Edgecombe and was no longer the Mill superintendent. Robinson testified that everything has been fine since Edgecombe became Mill superintendent.

Robinson testified that he saw racist graffiti in restrooms at ADM in 1998 and 1999. Robinson testified that Taylor complained about it and "it stopped after that."  Robinson testified that Taylor was promoted from an hourly position to a foreman position shortly after Taylor reported the graffiti to ADM management.  Robinson testified at his deposition taken on April 13, 2006, that he saw graffiti containing a picture of a confederate flag written on a toilet paper dispenser in the contractors' restroom approximately one week before the deposition.  It is undisputed that, after this

21

graffiti was reported by Ricky White, it was obliterated, the dispenser was ordered removed and ADM ordered additional signage to place in stalls stating that graffiti will not be tolerated.

Robinson also testified that he saw a "noose" laying on top of a machine sometime between 1998 to 2000. Robinson described it as a rope "tied in a loop" and testified that he did not report it. Robinson also testified that, in 2004 or 2005, he heard that Larry Phillips, an African American employee, found a rope lying on his lunch box. Robinson did not see it himself. Vincent testified that he saw this rope and thought it was a dog leash. Vincent investigated but was unable to identify who was responsible. Vincent testified that he conducted training after this incident to reiterate to the employees "our anti-harassment program, our discrimination program, as well as some other issues and leave 10 to 15 minutes of open forum to address any issues that they had." Vincent testified that part of the discussion was the nylon rope.

## C.  CONNELL GRAY

Plaintiff Connell Gray has worked at the Corn Processing Plant since March 11, 1996. Gray is represented by a union and covered by a collective bargaining agreement. Gray is employed in the refinery. In January 2001 Gray was awarded an operator 1 position which he has held since that time.

Gray claims that he was denied a maintenance position in 2003 because of his race. In April 2003, Gray signed a posting expressing his interest in a maintenance position and took a maintenance test on April 21, 2003. David Shain has been the maintenance superintendent at the Corn Processing Plant since December 2001, and he is responsible for deciding the most qualified candidates for maintenance vacancies. Gray testified that he never discussed the maintenance position with Shain prior to taking the test and also testified that he has never had any difficulties

22

with Shain.  Pursuant to the terms of the applicable collective bargaining agreement, ADM administers an aptitude test to applicants for maintenance positions in order to fill these positions. The aptitude test was created by Olson Consulting, and Olson scores the test.  After Olson scores the test, Olson provides Shain with a summary of each applicant's test results, with a cover sheet. On the cover sheet, employees are grouped by their overall rating on the test.  In filling positions, Shain begins with the individual listed at the top of the list and begins a more detailed evaluation and review process.  A "not rated" score on the test indicates that the individual was not ranked because the test results could not be interpreted.  Applicants whose test results are "not rated" are listed at the bottom of the summary cover page.

After Gray took the aptitude test in April 2003, Olson listed his results as "not rated" and his name was placed in the bottom category on the summary sheet.  After receiving the Olson scores for the individuals who took the April 21, 2003, test, Shain offered interviews to individuals in the order they were listed on the summary report and stopped interviewing when he filled the positions. While Gray has claimed that ADM discriminated against him by not giving him the opportunity to interview for the position, it is undisputed that only some of the applicants were interviewed.  The three applicants who were hired into maintenance all were ranked higher than Gray based upon their test results.  Shain testified that he is fairly certain that he has never interviewed anyone whose test results were "not rated."

Gray subsequently wrote a letter and complained to Vincent and Shain regarding discrimination in filling the maintenance positions.  Gray then spoke to Vincent about the maintenance test, and Vincent offered to meet with Gray to discuss his test scores, but Gray chose not to do so.  Gray testified that he chose not to meet with Vincent because he was upset ADM did

not approach him with regard to his test results and why he was not interviewed and he felt

"overlooked or ignored."  Gray testified that other applicants got a response.  Gray has not applied

for any other maintenance position.  It is undisputed that an entry level maintenance position

actually is a lower paying job than Gray's position as an operator 1 in the refinery.  Gray testified

that he does not have any facts to suggest that ADM did not hire the individuals it felt were most

qualified for the maintenance position.

Gray also testified that he was "discouraged" from applying for an instrumentation position.

Gray admitted that he never applied for this position, was not told by anyone at ADM not to pursue

this position, does not have any instrumentation experience and is not certified for the position.  It

is undisputed that Gray could not get into the maintenance instrumentation program without taking

the maintenance test, which he has not taken since April 2003.

Like the other Plaintiffs in this case, Gray also claims that he was subjected to a hostile work

environment based upon his race.  At his deposition in 2004, Gray stated that he had never been

called inappropriate names during his employment at ADM.  Gray did testify that he saw racial

graffiti in the contractor's bathroom.  He testified that he did not recall when he saw the graffiti and

did not report any graffiti to ADM management.  Gray testified that ADM eventually painted over

the graffiti, then removed the walls and replaced them with stainless steel walls.  Gray testified that

ADM also posted a policy stating that graffiti would not be tolerated.  Gray testified that he had not

seen any inappropriate racial slurs or race oriented graffiti since ADM erected the stainless steel

walls.

Gray testified at his 2006 deposition that, in November 2005, two salaried co-workers, Glenn

Hoppe and Jason Dolash, referred to him as "boy."  Gray testified that he estimated that Hoppe said

24

"boy" to him twice in a two week period.  Gray testified that, on each occasion, he told Hoppe he did not appreciate the use of the term "boy."  Hoppe apologized and Gray accepted his apology.  Gray also testified that he told Dolash, an engineer, that he did not have time to do something Dolash wanted done.  Dolash said, "well, you are going to listen to me boy."  Gray went to talk to Brad Hunt, the refinery superintendent.  Hunt then involved Vincent from Human Resources.  Vincent spoke to both Hoppe and Dolash regarding the incidents and provided them additional diversity training.  Vincent testified that he also arranged training classes for the entire department.  Gray testified that there have been no other incidents where either Hoppe or Dolash called him "boy."  Gray testified that Hunt and Vincent were responsive to his complaints.

Gray also claims that he was harassed on the basis of his race by being subjected to disparate discipline.  He testified that this claim is based on warnings he received for performance issues, which he received for "making mistakes" on the job.  Gray conceded that all of the disciplinary notices he received were for actual performance problems he experienced.  Gray testified that Mike Kruley, the refinery superintendent who issued the warnings to Gray in 2002 and 2003, said he "was trying to make sure that [Gray] understood the procedures because he thought [Gray] could be a very good operator."  Gray testified that each of the things Kruley discussed with him was about actual errors he had made.  Gray presented evidence that other employees had performance problems and did not receive warnings.  However, Gray did not know the circumstances surrounding the other incidents and did not know whether management was made aware of what had occurred on those occasions.

Gray also testified that, in March 2005, he received a verbal warning for insubordination based on an incident that occurred on March 13, 2005.  It is undisputed that, on that date, Brent

25

Johnson, the foreman for that evening, asked Gray how he was doing.  Gray asked him, "how does it feel to be a hated – to be a hated foreman in the refinery?"  Gray testified that there were other operators present at the time.  Gray contends that a white employee, Jennifer Bolyard, made similar comments and was not written up.

In addition to his hostile environment claim, Gray also raises a separate claim that he was subjected to discriminatory discipline at ADM.  On June 17, 2005, Gray received a three-day suspension for his behavior during a safety meeting which occurred on June 15, 2005. Gray testified that, during the safety meeting, he raised an issue about the heat inside the plant.  He testified that the superintendent, Brad Hunt, kept ignoring him.  Gray testified that he told Hunt "it was too fucking hot in here.  We need to do something about the fucking heat in this plant."  Gray testified that he "guess[ed]" that it seemed to Hunt that he was yelling.  After the meeting, Gray met with the plant manager, Bill Manley, who told Gray his behavior was not appropriate.  As noted, Gray was issued a three-day suspension.  Gray testified that he believed the discipline imposed was discriminatory because he heard that Chris Janes and John Larrison "did the exact same thing" during a safety meeting on another shift and were not suspended.  Gray admitted he was not present during this safety meeting and does not know who conducted the meeting.

## D.  RICKY WHITE

ADM hired Ricky White on June 25, 1986.  White works as an operator 1 in the refinery. On March 21, 2002, White executed a release of all claims, including civil rights claims, against ADM as part of the resolution of a gender discrimination complaint White filed against ADM before the Illinois Human Rights Commission.  The agreement required payment by ADM to White of $7,500 and was fully executed on April 11, 2002.

26

White now claims that he was denied supervisor positions based upon his race. He specifically referred to positions which were awarded to Sean Karakachos, Brent Johnston, and Kerry Hood. ADM has provided evidence that Johnston was promoted on May 14, 2001, Karakachos was promoted on October 1, 2001, and Hood was promoted on October 1, 2002. Hood was recommended for promotion by Mike Kruley, who became the Corn Plant Refinery Superintendent on August 1, 2002. Kruley made this recommendation by considering the individuals who were serving in the role of temporary shift supervisor when he arrived in the department, which included Hood and Chris Pilger. Kruley determined that between Hood and Pilger, Hood was the better candidate based on his positive attitude, experience in the department, and knowledge of the refinery processes. Kruley did not consider White for the position because White had not worked as a temporary shift supervisor. Kruley also testified that he did not believe that he had any information suggesting that White was interested in a supervisor position. White testified that he "put his name on the sign-up sheet just like everyone else" and had more experience than the other candidates did. However, White does not dispute Kruley's testimony that Kruley does not believe he had any information that White was interested in the position.

Bill Manley, who was plant manager at the time, agreed with Kruley's recommendation and promoted Hood. White did not inquire as to why he had not been selected for the position until June 2003. Kruley and Vincent met with White and his union steward about the issue on July 1, 2003. Vincent testified that, at the meeting, White said he would not be a supervisor now if they asked him. White testified that he does not recall making that statement at the meeting but does not know if he made the statement. White testified that he was denied another supervisor position in late 2005 or early 2006, when Dennis Salmons was chosen to replace Jimmy Jackson. White

testified that he knew Jackson would be replaced and "should have expressed my interest and didn't even know it.  I didn't ask anyone, and I never spoke to anyone."

White also claims that he has been subjected to a racially hostile work environment.  In support of this claim, White testified that he overheard a employee, now retired, use a racial epithet in 1986.  White also testified that he has seen inappropriate graffiti in the restroom.  White testified he never reported the graffiti.  He also testified that the graffiti stopped after ADM posted a notice stating that those responsible for the graffiti would be terminated if caught.  White testified at his deposition taken in April 2006 that he had seen graffiti in a bathroom one week before his deposition.  White testified that the graffiti was still there.  However, as noted previously, ADM has provided evidence that this graffiti was obliterated, the dispenser it was on was removed and ADM ordered additional signs to place in stalls to warn that graffiti would not be tolerated.

White also relies on the fact that he was given a notice of disciplinary action in March 2005.  On March 19, 2005, White was written up for insubordination and disrespect.  The write-up was based upon an incident where Johnston, White's supervisor, was speaking with Chris Janes.  White said words to the effect of "Don't trust him.  He'll stab you in the back."  Johnston testified that he believed White made the comment about him.  When Johnston asked White about his comment, White said "I'm not talking to you."  Based upon this incident, Refinery Superintendent Brad Hunt gave White a written warning for being insubordinate and disrespectful.  White testified, and told Vincent at the time, that he was referring to a different supervisor when he made his initial remarks.  White contends that the disciplinary action was discriminatory because Johnston had previously required White and Gray to do cleanup work in the plant.  White admitted that Johnston gave cleaning assignments to white employees also, but stated he believed Johnston singled him and Gray

28

out for such tasks.

## IV.  DECATUR EAST SOYBEAN PLANT - BRUCE TURNER

Turner began working for ADM in 1988 at ADM's Decatur hydrofarm.  In 1989, Turner moved to ADM's corporate office and performed custodial work.  He was hired to work at the East Soybean Plant in November 1990.  Turner is a member of the union and is covered by the applicable collective bargaining agreement.

Turner began his employment at the East Soybean Plant as a laborer.  In 1992, he was advanced into a utility position.  In August 1994, Turner bid successfully into an operator 2 position.  However, Turner was disqualified from the operator 2 position in February 1996 and returned to a laborer position.  Turner was disqualified from the position for mis-managing tanks.  Turner claims that he was not given any instruction or training on how to manage the particular type of tank to which he was assigned.  Turner successfully bid into a utility position in March 1996, and then to an operator 1 position in August 1996.  However, Turner was disqualified from the operator 1 position in October 1997 and again returned to a laborer position.  The reason given for Turner's disqualification was that he failed to follow procedure in starting up the plant.  Turner claims, however, that he received no training on starting up the plant.  Matthew Philips has worked at the Soybean Plant since 1988 and has been the Soybean Plant Manager since November 2001.  Philips testified that Turner "had been given ample training up to that time."  Turner was awarded an operator 2 position in 1999.  However, Turner agreed to be removed from the position because of a knee injury, and returned to a laborer position once again.  In 2001, Turner was awarded a utility

position and held that position until his employment was terminated in January 2004.[6]

In this case, Turner claims that he was denied promotions based upon his race. Turner claims he was discriminated against when he was denied the opportunity to serve as a temporary or fill-in foreman. Turner testified that he told his supervisor several times that he would like to learn to fill in as a foreman, but stated that he had no idea at all regarding the dates when he made these requests. However, it is undisputed that Turner filed a grievance in April 2000 and complained about the filling of a temporary foreman position in March 2000. According to ADM, Turner was not selected for a temporary or fill-in foreman position because he was not considered qualified, based upon his performance.

Turner also claims that he was discriminated against when ADM did not give him a maintenance position in the Soybean Plant. Turner took the test for the position in April 2002. The summary sheet prepared by Olson Consulting showed that Turner received a "not rated" score on the test. Rick Campbell was a white employee who was hired into a maintenance position. The summary sheet showed that Campbell received an "average" score on the test and was rated "above average" on work habits. In addition, Campbell had worked for a subcontractor performing maintenance work at the ADM Soybean Plant for a number of years. Turner testified that he had "no maintenance experience such as Rick Campbell."

Turner testified that he applied for an operator 1 position in the elevator department in May 2003. Turner had never worked in the elevator department, but agreed that operator 1 employees in that department were responsible for safely operating rail switches controlling the movement of rail cars on plant premises in circumstances where mistakes could cause serious injury or even death.

_____

[6] Turner has alleged that his termination was based upon race discrimination in a separate case filed on October 26, 2005, <u>Turner v. ADM</u>, Case No. 05-CV-2241.

The reason ADM gave Turner for not awarding him the operator 1 position was that he had been disqualified from other operator positions in the past.  This position was awarded to Matt Green. Green had less seniority than Turner but had never been disqualified from any operator position. Turner testified that he was denied an operator 2 position in July 2003 that was awarded to Robert McGuire.  It is undisputed that Turner had more seniority than McGuire.  ADM informed Turner that Turner was not awarded the position because Turner previously had been disqualified from an operator 2 position in 1996.  It is undisputed that McGuire had not been disqualified from any operator position prior to being awarded the operator 2 position in July 2003.  Philips testified that, in considering Turner for the operator positions in 2003, he did not know what Turner "could have done to improve his ability to retain information."

Turner claims that he was the victim of race discrimination regarding these promotions to operator positions because white employees have been permitted to move into operator positions after being disqualified.  Turner testified that, specifically, Robert Cox was permitted to move into an operator position after having previously been disqualified.  Turner does not dispute, however, that Cox was denied a bid to an operator 2 position on July 11, 2000, despite being the senior bidder, due to Cox's prior disqualifications.  The record also shows that, as noted, Turner was promoted to operator positions in 1996 and 1999, after he had been disqualified.  In addition, Turner testified that he agreed that, in filling an operator position, management had the right to consider whether an individual had been previously disqualified from a position.

Turner, along with all of the other Plaintiffs in this case, claims that he was subjected to a hostile work environment based upon his race.  Turner claims that he was harassed on May 1, 2000, when he was asked by his supervisor to shovel material in the plant.  Turner testified that he had

seen some racial graffiti in a bathroom at the Soybean Plant.  When asked how frequently, Turner testified, "not often."  Turner testified that he "never reported it."  Turner testified that, in response to the graffiti, ADM covered some of the graffiti with a marker and removed one wall.  In his 2006 deposition, Turner alleged, for the first time, that he was harassed by being referred to as "Bubba" by three of his supervisors, one of whom is African American.  Turner testified that he never complained to anybody in management that he found the use of the name "Bubba" offensive.

Turner has also raised a wage discrimination claim.[7]  Specifically, Turner claims that he was denied overtime assignments based upon his race.  On April 7, 2000, Turner submitted a grievance and claimed that he was "singl[ed]" out and not given overtime assignments on two specific dates, April 3 and April 7, 2000.  In his grievance, Turner stated that he had minor surgery and returned to work on March 27, 2000, with the same work restrictions that he had before.  He stated that he worked overtime when there was work available that he could do within his restrictions but claimed that Frederick Kelm, the plant superintendent, was not assigning overtime fairly.  Turner's grievance basically contended that he should be given overtime whenever he asked for it if work was available within his restrictions and any other co-workers were working overtime.  Kelm testified that he denied Turner's grievance because he was not singling Turner out to be denied overtime assignments.

Turner also claims that he was discriminated against on November 2, 1999, when he was assigned to clean white side coolers.  When Turner stated that he could not get into the coolers because of his medical restrictions, Kelm sent him home without pay.  According to Turner, white

_____

[7] In their Amended Complaint (#71), Plaintiffs claimed they were discriminated against with respect to their pay.  The record shows that representations were made by Plaintiffs' counsel that Plaintiffs were not pursuing compensation claims.  However, in response to ADM's Motions for Summary Judgment, Morris and Turner have claimed that they were denied overtime based upon their race.

employees with medical restrictions were allowed to work in assignments that did not interfere with their medical restrictions.

In addition, Turner claims that he was subjected to discriminatory discipline.  Turner claims that Kelm gave him a verbal warning and sent him home for being out of his work area in April 2000.  Turner testified that he was actually performing work in another area at the time, as part of his job duties, and claims that he was not paid for the time he missed.  Turner testified that he missed "an hour, an hour and a half."  Turner also claims that a white employee left his work area for extended periods without being punished.  Turner testified, however, that he was not aware of "any Caucasian employees that Mr. Kelm was unable to find who did not have the same disciplinary action."

## PROCEDURAL HISTORY

On January 30, 2004, Plaintiffs filed their Amended Consolidated Complaint (#40) in this court alleging class and individual claims of race discrimination.  Following class phase discovery, Plaintiffs withdrew their class allegations on February 8, 2005.  On February 22, 2005, Plaintiffs filed their Amended Complaint (#71) based upon individual allegations against ADM.  On July 6, 2006, ADM filed nine separate Motions for Summary Judgment, a separate motion for each Plaintiff's claims.  Plaintiffs filed nine separate Responses, and ADM filed nine Replies.

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole."  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000), quoting Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002); see also Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 938 (7th Cir. 2003).  Speculation, however, is not the source of a reasonable inference.  See Burwell, 213 F. Supp. 2d at 929, citing Chmiel v. JC Penney Life Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998).

Therefore, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248.  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004).  If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted.  Anderson, 477 U.S. at 249-50.  It is true that the summary judgment standard is applied with special scrutiny to employment discrimination cases, which often turn on the issues of intent and credibility.  Michas, 209 F.3d at 692.  However, even in an employment discrimination case, neither the mere existence of some alleged factual dispute between

34

the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment.  <u>Michas</u>, 209 F.3d at 692.  Moreover, a plaintiff cannot defeat summary judgment by raising immaterial issues of fact.  <u>See</u> <u>Jordan v. Summers</u>, 205 F.3d 337, 345 (7th Cir. 2000).  Material facts are facts that "might affect to outcome of the suit" under the applicable substantive law.  <u>Anders v. Waste Mgmt. of Wis., Inc.</u>, 463 F.3d 670, 675 (7th Cir. 2006), <u>quoting</u> <u>Anderson</u>, 477 U.S. at 248.

## II.  PLAINTIFFS' CLAIMS

This court first notes that ADM has raised various issues regarding the timeliness of some of the Plaintiffs' claims under Title VII, the failure to include some claims in a charge of discrimination, and the fact that some claims are based on incidents which allegedly occurred after the filing of Plaintiffs' Amended Complaint (#71).  Plaintiffs have uniformly opposed these arguments and are seeking a ruling from this court on all claims discussed in the Motions for Summary Judgment.  This court concludes that, while it appears certain that some of Plaintiffs' claims are not viable under Title VII based upon Title VII's procedural requirements, the claims may still be viable under 42 U.S.C. § 1981.  Racial discrimination is prohibited both by Title VII and § 1981, and the methods of proof and elements of the case under Title VII and § 1981 are essentially identical.  <u>Sublett v. John Wiley & Sons, Inc.</u>, 463 F.3d 731, 736 (7th Cir. 2006); <u>see also</u> <u>Anders</u>, 463 F.3d at 675.  Therefore, rather than spending time determining whether some claims cannot properly be brought under Title VII, this court will proceed to the merits of all of Plaintiffs' claims.

## A.  RACE DISCRIMINATION - PROMOTIONS

All of the Plaintiffs, except for Robinson, are claiming that ADM failed to award them various promotions because of their race.  Plaintiffs do not claim to have direct evidence of

35

discrimination as far as their promotion claims and must proceed under the more common indirect, burden-shifting method set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Each Plaintiff therefore has the initial burden of establishing a prima facie case of race discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was rejected for the position; and (4) the employee promoted was not a member of the protected group and was not better qualified than the Plaintiff.  <u>Sublett</u>, 463 F.3d at 737.

If any Plaintiff passes the hurdle of establishing a prima facie case, the burden shifts to ADM to articulate a legitimate, nondiscriminatory reason for its action, "which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  <u>See</u> <u>Sublett</u>, 463 F.3d at 737, <u>quoting</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 507 (1993).  At that point, the Plaintiff resumes his original burden of proof and must establish by a preponderance of the evidence that ADM's proffered reasons are pretextual.  <u>Sublett</u>, 463 F.3d at 737.  Pretext is a "lie, specifically a phony reason for some action."  <u>Sublett</u>, 463 F.3d at 737, <u>quoting</u> <u>Russell v. Acme-Evans, Co.</u>, 51 F.3d 64, 68 (7th Cir. 1995).  The Seventh Circuit has held that "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."  <u>Sublett</u>, 463 F.3d at 738, <u>quoting</u> <u>Mlynczak v. Bodman</u>, 442 F.3d 1050, 1059 (7th Cir. 2006).  A plaintiff does not reach the pretext stage, however, unless he first establishes a prima facie case of discrimination.  <u>Peele v. Country Mut. Ins. Co.</u>, 288 F.3d 319, 326 (7th Cir. 2002).  With these standards in mind, this court will address each Plaintiff's claims in turn.

1. JOYNER

Joyner claims that he was discriminated against when he was not promoted to a lead man position or a shift supervisor position.  However, Joyner concedes that he never applied for a shift supervisor position and did not express interest in a lead man position until he discussed the position with Smith in 2002.  It is well settled that, in order to establish a prima facie case, a plaintiff must show he applied for the promotion.  McDonnell Douglas, 411 U.S. at 802; Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003); see also Sublett, 463 F.3d at 739 (district court rightly rejected the plaintiff's contention that her rights were violated when her employer did not consider her for a position in which she did not express an interest).  Joyner argues, however, that management at ADM hand-selected employees for the lead man position and then selected employees in the lead man positions for shift supervisor positions.  Joyner therefore claims that he can "bypass" the application requirement "because he was discouraged from applying because of the very practices that he challenges are discriminatory, *i.e.* the grooming and selecting of white employees for the [lead man] position, and ultimately the salaried supervisor position."  Joyner relies on Loyd v. Phillips Bros,. Inc., 25 F.3d 518, 522-23 (7th Cir. 1994), and Box v. A& P Tea Co., 772 F.2d 1372, 1377 (7th Cir. 1985).  This court concludes that the cited case law does not support Joyner's arguments.

In Loyd, the plaintiff was a female employee who claimed she was denied promotions by her employer.  The district court granted summary judgment in favor of the employer because the plaintiff did not inform her supervisors that she wished to be considered for a promotion.  Loyd, 25 F.3d at 522.  The Seventh Circuit reversed, noting that the uncontested evidence showed that all women employees were classified as J-2 workers and, in promoting employees to J-1 positions, the employer only approached and promoted employees who were classified as general productions

workers (GPWs), who were all male.  Loyd, 25 F.3d at 521.  The Seventh Circuit also noted that the evidence showed that the plaintiff would have taken a J-1 position if it had been offered to her. Loyd, 25 F.3d at 521, 523.  The Seventh Circuit stated that "where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequence is established."  Loyd, 25 F.3d at 523; see also Hudson v. Chicago Transit Auth., 375 F.3d 552, 558 (7th Cir. 2004) (plaintiff who does not apply for promotion cannot make a prima facie case for unlawful discrimination unless the plaintiff demonstrates that the employer's discriminatory practices deterred the plaintiff from applying).

In Box, the Seventh Circuit stated that, in situations where the employer uses a promotion system in which employees do not apply for promotions but rather are sought out by managers, the employee can make a prima facie case by showing that had he known of the open position, he would have applied for the position.  See Box, 772 F.2d at 1376-77; Sembos v. Philips Components, 2003 WL 1342985, at *5 (N.D. Ill. 2003), aff'd, 376 F.3d 696 (7th Cir. 2004).  However, in Box, the Seventh Circuit concluded that the evidence the plaintiff presented did not suggest "anything more than a vague interest" in the position, noting that she "needed to do more than show she had a general interest in obtaining some job other than the one she had."  Box, 772 F.2d at 1377.  In Sembos, United States District Judge Blanche M. Manning concluded that, based upon Box, an employee must show more than a "vague interest" in the position for which she was allegedly precluded from obtaining based on a discriminatory animus and, in order to show that she would have applied for the position, must show that she "explicitly expressed her desire" for the promotion.

38

See Sembos, 2003 WL 1342985, at *5.  Judge Manning stated that this "desire may be established by showing that the employee made 'informal inquiries' about being considered for a certain position or positions."  Sembos, 2003 WL 1342985, at *5.

In this case, the evidence shows that openings for lead man positions were not posted. However, this court concludes that ADM presented ample evidence that employees interested in this position were required to let their supervisor know of their interest.  For example, Smith, an African American employee who was promoted to a lead man position, testified that he informed the plant manager when he began his employment at ADM in 1998 that he was interested in becoming a supervisor.  Smith testified that he "constantly made an effort to let them know that I was interested in being a supervisor."  This court also concludes that Joyner did not present any evidence which supports his argument that he was discouraged from applying because candidates were "hand-selected" by ADM.  This court therefore concludes that this case is not even remotely similar to the factual situation in Loyd and agrees with Judge Manning that, in order to establish a prima facie case, Joyner must show that he explicitly expressed his desire for the position sought.  Because the evidence shows that Joyner failed to express any interest in a shift supervisor position and failed to express interest in a lead man position prior to early 2002, Joyner cannot establish a prima facie case of discrimination regarding the shift supervisor position or any lead man positions filled prior to 2002.

As far as the lead man positions awarded after Joyner expressed his interest in 2002, this court agrees with ADM that Joyner's conclusory assertions about the comparative qualifications of other employees is not sufficient to establish a prima facie case of discrimination.  Joyner argued that he could "establish that he is better qualified than some of the individuals who were selected,"

39

without specifying which employees he was better qualified than.[8]  In addition, Joyner relied solely on a portion of a 1998 evaluation and his declaration which set out his own assessment of his qualifications.  The Seventh Circuit has stated that "it is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact." Sublett, 463 F.3d at 740; see also Sembos, 2003 WL 1342985, at *7 (an "employee's appraisal of his own qualifications has no evidentiary value").  The Seventh Circuit has "repeatedly stressed" that courts "'do not sit as a superpersonnel department' where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." Blise v. Antaramian, 409 F.3d 861, 867 (7th Cir. 2005).  Joyner has not shown that the employees promoted to a lead man position after he expressed his interest were not better qualified for the position.  Therefore, Joyner has not established a prima facie case of discrimination as to those positions.

For the reasons stated, this court concludes that ADM is entitled to summary judgment as to Joyner's promotion claims.

## 2. MANN

Mann also claims that he was discriminated against when he was not promoted to a lead man position or a shift supervisor position.  However, Mann testified that he did not apply for a lead man position or shift supervisor position prior to January 16, 2003.  Mann argues, like Joyner, that he could bypass the application requirement because management hand selected employees for these positions so that he was discouraged from applying because of the very practices that he challenges are discriminatory.  Mann also relies upon Loyd and Box.  This court notes that, like Joyner, Mann has not presented any evidence which supports his argument that he was discouraged from applying

---

[8]  This court notes that, in fact, Joyner testified that he was "just as qualified" as the individuals selected for the position.

40

because ADM "hand-selected" candidates for the position.  This court, again, concludes that <u>Loyd</u> and <u>Box</u> do not support Mann's argument that he was not required to apply for the positions he sought.  This court concludes, based upon <u>Box</u>, that Mann was required to "explicitly express[] [his] desire" for the promotion.  <u>See</u> <u>Sembos</u>, 2003 WL 1342985, at *5.  Because Mann has presented no evidence that he expressed a desire for either a lead man or shift supervisor position prior to January 16, 2003, he cannot establish a prima facie case of discrimination as to ADM's failure to promote him to those positions prior to that date.  Mann has not specified any promotion awarded following January 16, 2003, that he should have been awarded and was denied based upon his race.  The evidence shows that, by the time Mann told Lightner he was interested in a shift supervisor position, Lightner had already selected Brad Mullen for an open shift supervisor position, based upon Mullen's overall qualifications.  For all of the reasons stated, this court concludes that ADM is entitled to summary judgment on Mann's claims that he was not promoted to a lead man or shift supervisor position based upon his race.

ADM has pointed out that, although Mann testified about an operator position, and claimed that he was discriminated against when he failed to qualify for the position, and also testified that he was not given a forklift driver position he requested, Mann did not address these purported failure to promote claims in his Response.  This court therefore agrees with ADM that Mann has abandoned any failure to promote claims with respect to these positions.  This court therefore concludes that ADM is entitled to summary judgment on all of Mann's promotion claims.

### 3.  OWENS

Owens claims that he was discriminated against when he was not promoted to a step-up production worker (filler) position and when he was denied a lead man position and shift supervisor

position.  As far as the step-up production worker (filler) position on the retail line, this court agrees

with ADM that Owens has not shown that the white employee who received the position, Simpson,

was not better qualified for the position.  Owens testified that Simpson had experience working in

the retail area.  Owens testified that he had previous forklift experience and was given a forklift

position.  In arguing that he was discriminated against, Owens has relied on his own assessment of

his abilities and his self-serving testimony that he "knew more about learning machinery."  As

previously discussed, that is not sufficient.  See Sublett, 463 F.3d at 740; Sembos, 2003 WL

1342985, at *7.

    As far as a supervisor position, Owens testified that he spoke to Jacob Stolzfus, a production

assistant, in the spring of 2001 about a lead man position.  Owens testified that he did not express

interest to Plant Manager Lightner until early 2003.  There is no real dispute that Stolzfus was not

a supervisor who made promotion decisions.  There is also no real dispute that Lightner had already

promoted four individuals prior to the time Owens expressed interest and there were no openings

after Owens expressed interest to Lightner.  In opposing ADM's Motion for Summary Judgment,

Owens argues that he was not required to apply for the positions based upon Loyd and Box.  Owens

testified that he "believed" that ADM just picked employees for supervisor positions. After this

court's careful review of the evidence presented in this case, this court agrees with ADM that the

factual situation here is much different from the situation in Loyd.  This court also agrees that, based

upon Box, Owens had to do more than show a generalized statement of interest in a position to show

he would have applied for the position.  This court further agrees with ADM that, under the

circumstances here, Owens cannot establish a prima facie case of discrimination as to positions he

did not apply for.

42

This court concludes that Owens has not established a prima facie case of discrimination regarding promotions he did not receive.  Accordingly, ADM is entitled to summary judgment as to Owens' promotion claims.

### 4. MORRIS

Morris claims that he was not promoted to an operator 1 position based upon his race.  The evidence shows that two different methods were used by ADM to choose who would be promoted to operator 1 positions during the time Morris was seeking such a position.  The evidence shows that most of the promotions were based upon seniority and that Morris was not promoted because he was not the most senior operator 2 when the promotions were made.  During the time that ADM used a point system, two operator 2 positions were filled by Michael Brown, who is African American, and John Boo, a white employee.  When Brown was promoted, the top three scorers on the point system were African American and Morris scored seventh out of the eight considered.  When Boo was promoted, Morris had a lower score on the point system than Boo.

Morris claims that he has established a prima facie of discrimination.  As to one of the employees who was promoted based upon seniority, Danny Cunningham, Morris argues that he was more qualified because Cunningham was not interested in the position and took five months to learn the job.  In support of this argument, Morris cites to his own testimony that Cunningham was "never even interested at first," stating that "[t]hey asked him several times."  However, Morris admitted that he was not present for those discussions and provided no factual basis for his belief that Cunningham was not interested in a position Cunningham accepted.  Morris has also cited to his Revised Responses to Defendant's First Set of Interrogatories, which are similarly lacking in supporting facts.  Because it is undisputed that Cunningham had more seniority than Morris, this

43

court concludes that Morris has not shown that Cunningham was not better qualified than Morris for the position.  Therefore, Morris has failed to establish a prima facie case of discrimination as to this position.  As to the position awarded to Boo, Morris argues that he was not scored fairly on the point system, based upon his race.  In support of this argument, Morris has cited to his own testimony that supervisors' "grading of an employee, it can always be used to hold someone back." Morris acknowledged, however, that the three top scorers the first time the point system was used were all African American.  Morris also cited to the qualification worksheet showing the points awarded to the candidates for the position awarded to Boo.  This shows that the highest score was given to Howard Person, Jr., an African American employee.  Person, however, had accepted a position in maintenance, so the position was offered to Boo, who had the second highest score.  This court concludes that Morris has not provided any evidence to support his speculation that he was not scored fairly, based upon his race.  Therefore, Morris has not shown that Boo was not better qualified for the position and has not established a prima facie case of discrimination as to this promotion.

Morris spends a great deal of time arguing that ADM's changing criteria for selecting employees for promotion to the operator 1 position raises a genuine issue of material fact regarding pretext.  However, because Morris has not established a prima facie case, there is no need to discuss pretext.[9]  See Peele, 288 F.3d at 326.

Morris has also claimed that he should have been awarded an operator position in 2003 when Mark Diekoff left to take a maintenance position.  The evidence presented to this court shows that

_____

[9]  This court does note, however, that Morris' argument that changing to the point system shows discrimination is severely undercut by the fact that African American employees were the top scorers on the point system.

44

Diekoff left the position for one week and then decided to return to the position, which had not been filled. ADM also provided evidence that, if the position had been filled, Jose Reyes, who was senior to Morris, would have received the position. This court agrees with ADM that Morris has not shown that ADM discriminated in any way when it did not fill the position for a short period of time and allowed Diekoff to return to the position.

Morris also claims that he was discriminated against when he was denied a position in the lab in 2002. It is undisputed, however, that the position was given to Mike Jurick who had previous experience working in the lab department. Morris argues that he expressed interest in the position right away and that, if he had been selected for the position as soon as it became open, he could have been trained in the position. He therefore argues that a genuine issue of material fact exists regarding the relative qualifications of Morris and Jurick. Morris has not cited any supporting authority for this rather novel "he would have been more qualified if he had been trained" argument, and this court concludes that the argument has no merit. See Sembos, 376 F.3d at 702 (employee's subjective belief that he "may" be able to perform the job with additional training insufficient). In any case, this court agrees with ADM that "a lag in filling the vacancy," something which is not uncommon in filling positions, cannot support a claim of discrimination. Because it is undisputed that Jurick had experience working in the lab department, which Morris did not, Morris has not shown that Jurick was not more qualified for the position and cannot establish a prima facie case of discrimination.

Morris has also claimed that he was discriminated against when he was denied a position in maintenance. The evidence shows that Morris signed up to be considered for a maintenance position on May 29, 2002, and that candidates for entry level positions in the maintenance department were

45

evaluated in three areas.  The evidence also shows that, when Morris' overall score based upon all three components was calculated, he had the lowest score of the 11 employees who applied for the maintenance position.  The three available positions were given to the three employees who had the highest overall scores.  Morris nevertheless contends that he has established a prima facie case of discrimination because he contends that his scoring was tainted by discriminatory animus and he should have received higher scores on various aspects of the evaluation.  Morris has little beyond his own speculation to support his claim that his evaluation was tainted by discrimination.  Moreover, when Morris was given the opportunity to testify regarding the scores he believes he should have received, his overall score was still lower than the three employees who received the maintenance positions.  This court concludes that Morris has not shown that the employees who received the positions were not more qualified.  Therefore, this court agrees with ADM that it is entitled to summary judgment on this claim.

### 5. FREEMAN

Freeman claims that he was discriminated against when Brian Dickey, a white male employee, became a temporary shift supervisor.  It is undisputed that Freeman had more seniority than Dickey.  While Freeman testified that he spoke with the Human Resource Manager, Vincent Joyner, about his interest in a foreman or supervisor position, it is undisputed that Freeman never expressed interest in a temporary shift supervisor position.  In addition, Freeman admitted that he was not contending that he was discouraged from seeking a temporary shift supervisor position.  Freeman specifically testified that he believed it was racially discriminatory that he was not selected for a position he never expressed any interest in because he "wasn't asked."

Freeman argues in his Response to ADM's Motion for Summary Judgment that, because

46

temporary shift supervisor positions were not posted, he was not required to demonstrate an explicit expression of interest in the position.  Freeman cites Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) in support of this argument.  Carmichael, however, is a decision of the Eleventh Circuit and is persuasive authority only.  In any case, this court concludes that Seventh Circuit case law does not support Freeman's argument and Seventh Circuit case law is, obviously, controlling.  This court has already concluded that, based upon Seventh Circuit case law, an employee must show more than a "vague interest" in a position and must show that he explicitly expressed his desire for the position in order to establish a prima facie case of discrimination.  See Box, 772 F.2d at 1377; see also Sembos, 2003 WL 1342985, at *5.  This court further concludes that there is no support for Freeman's contention that he was discriminated against because he "wasn't asked" if he wanted the position.  Because it is undisputed that Freeman never expressed interest in a temporary shift supervisor position, he cannot establish a prima facie case of discrimination and ADM is entitled to summary judgment on this claim.

### 6. GRAY

Gray claims that he was discriminated against when he was denied a maintenance position in 2003.  The evidence shows that Gray took the aptitude test for this position and received a result of "not rated" because the test results could not be interpreted.  A summary sheet of the applicants' scores on the test was prepared by Olson Consulting, and Gray's name was placed in the bottom category on the summary sheet.  Shain, the maintenance superintendent, testified that he offered interviews to applicants in the order they were listed on the summary sheet and testified that he was fairly certain that he has never interviewed anyone whose test results were "not rated."  The three applicants who were hired into maintenance positions at that time all were ranked higher than Gray

47

based upon their test results.

Gray argues that he has established a prima facie case of discrimination because he has a college degree in a maintenance field and has shown that the candidates selected for the position were not more qualified for the position. Even assuming that this is true, this court agrees with ADM that it has shown a legitimate, non-discriminatory reason for failing to hire Gray for the position - his test scores. This court also agrees with ADM that Gray has not shown that this reason was a pretext for discrimination. Gray first argues that complete reliance on the test "confounds the directives of the test itself." However, Gray has not presented any evidence that ADM did not honestly believe the individuals it hired were more qualified, based upon their higher test scores. Gray is asking this court to sit as a "super personnel department" and decide that ADM's hiring process was flawed. The Seventh Circuit has repeatedly held that this is not the court's role. See Blise 409 F.3d at 867; Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 785 (7th Cir. 2004).

Gray also argues that there was a stark underutilization of African Americans in maintenance positions and contends that this establishes pretext. However, Gray has totally failed to offer sufficient "statistics" to meet his burden. The Seventh Circuit has stated that, in order to establish pretext, a plaintiff "must do more than merely point to race and proclaim: 'Aha! Discrimination.'" Hague v. Thompson Dist. Co., 436 F.3d 816, 829 (7th Cir. 2006). The Seventh Circuit has explained that, if plaintiffs rely on the racial composition of a workforce as evidence of discrimination, it must "subject all of the employer's decisions to statistical analysis to find out whether [race] makes a difference." Hague, 436 F.3d at 829, quoting Millbrook v. IBP, Inc, 280 F.3d 1169, 1177 (7th Cir. 2002). "[W]ithout knowing how many positions became available during the relevant time frame,

the number and race of the candidates applying for those positions, and the candidates' relative qualifications, '[s]uch a list is next to worthless.'" Hague, 436 F.3d at 829, quoting Millbrook, 280 F.3d at 1177.  The court in Millbrook stated that the fact that during a two-year time frame no African Americans were hired to fill an unknown number of vacancies failed to show pretext. Millbrook, 280 F.3d at 1177.  Here, Gray has simply stated that there were no African Americans in the maintenance department from 2001 to 2003, without providing any of the additional required information.[10]  This is insufficient to show pretext.  See Hague, 436 F.3d at 829; Millbrook, 280 F.3d at 1177.

Gray also claims that, because he was denied a promotion to the maintenance position, he was prevented from advancing to an instrumentation position.  He argues that this was a "hidden, but particularly invidious" result of ADM's maintenance selection practices.  This court concludes that this claim is dependent on his claim regarding the maintenance position and, because that claim fails, this claim also must fail.  This court therefore concludes that ADM is entitled to summary judgment on Gray's promotion claims.

### 7. WHITE

White claims that he was denied supervisor positions based upon his race.  However, ADM has provided evidence that two of the promotions White claims he should have received were awarded prior to March 21, 2002, the date White executed a release of all claims against ADM.  This court agrees with ADM that White obviously cannot pursue claims which he has released.  White argues that he has raised a genuine issue of material fact regarding the date of these promotions because he testified that the information in his EEOC charge, which stated that the promotions

---

[10]  It is undisputed that, since Gray took the test in 2003, two hourly African American employees and one African American supervisor were hired into the maintenance department.

occurred after March 21, 2002, is correct.  However, White testified that he did not know the actual date of either promotion and was not aware of any facts to suggest that the promotions did not occur on the dates stated by ADM.  This court has no trouble concluding that no genuine issue of material fact exists regarding the date of these promotions and that White cannot pursue these claims because they have been released.

ADM did promote Kerry Hood on October 1, 2002, and White's claim regarding this promotion has not been released.  White claims that he has established a prima facie case of discrimination as to this promotion, arguing that he had more seniority and experience than Hood. This court concludes that White cannot establish a prima facie case because he did not show that he expressed interest in the position.  White did not dispute Kruley's testimony that Kruley did not believe that he had any information that White was interested in the position.  White provided only rather vague testimony that he "put his name on the sign-up sheet just like everyone else" but did not state what he signed or when.  In any case, Kruley testified that he only considered candidates who had experience as a temporary shift supervisor, experience that White did not have.  Hood had experience as a temporary shift supervisor, and Kruley testified that he selected Hood for the supervisor position based upon his positive attitude, experience in the department and knowledge of the processes.  This court therefore also concludes that White has not shown that Hood was not more qualified for the supervisor position, based upon his experience as a temporary shift supervisor.      White also claims that he was denied another supervisor position in late 2005 or early 2006. However, White testified that he "never spoke to anyone" about this position and cannot

establish a prima facie case of discrimination regarding this promotion.[11]  For the reasons stated, this court concludes that ADM is entitled to summary judgment regarding White's promotion claims.

### 8.   TURNER

Turner claims that he was denied an opportunity to serve as a temporary or fill-in foreman. Turner argues that he was more qualified than at least one of the white individuals selected for a fill-in foreman position, Dave Miller.  Turner bases this argument solely on his own declaration concerning his qualifications.  This court has previously noted that an employee's conclusory statements and appraisal of his own qualifications cannot raise a genuine issue of material fact.  See Sublett, 463 F.3d at 740; Sembos, 2003 WL 1342985, at *7.  ADM argues that Turner was not qualified for the position because he had twice been disqualified from operator positions, which are among the positions foremen supervise.  ADM points out that Turner has not offered evidence that any non-minority employee who had similar disqualifications was ever offered a temporary foreman position.  Based upon the evidence presented in this case, this court agrees with ADM that Turner has not established a prima facie case of discrimination regarding this position because he has not shown that the person selected was not more qualified for the position.

Turner also claims that he was discriminated against when he was not given a maintenance position.  The evidence shows that Turner received a "not rated" score on the test.  The employee who received the position, Rick Campbell, received an "average" score on the test and had prior experience performing maintenance work.  At his deposition, Turner testified that he knew Campbell and knew that Campbell had experience "doing maintenance oriented tasks."  Turner specifically

---

[11]  In addition, Vincent testified that, at a meeting he had with White and Kruley on July 1, 2003, White said he would not be a supervisor now if they asked him.  White testified that he could not recall making that statement but does not know if he made the statement.  This provides additional evidence that ADM had no reason to believe that White was interested in the position.

51

testified that he had "no maintenance experience such as Rick Campbell." Turner also did not dispute ADM's statement in its Statement of Undisputed Material Facts that the maintenance work Turner performed when he worked at ADM's corporate office was significantly different from the maintenance jobs in ADM's processing plants. Turner nevertheless argues that he has established a prima facie case of discrimination as to this position and now asserts that he was more qualified than Campbell for the position. Turner bases this argument on his declaration in which he states that he "had significant electrician experience that Campbell did not have." This court concludes that this declaration is insufficient for two reasons: it is a self-serving assessment of his own qualifications and it contradicts Turner's clear prior testimony.

A "party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." Velez v. City of Chicago, 442 F.3d 1043, 1049 (7th Cir. 2006), quoting Amadio v. Ford Motor Co., 238 F.3d 919, 926 (7th Cir. 2001). Therefore, in situations where a deposition and affidavit are contradictory, "the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Velez, 442 F.3d at 1049, quoting Amadio, 238 F.3d at 926.

Turner has not even attempted to explain the conflict between his clear deposition testimony and his contrary declaration. Therefore, this court has disregarded Turner's contradictory statement in his declaration. Based upon Turner's own testimony, this court concludes that he has not shown that the employee chosen for the position, Campbell, was not more qualified for the position.

Turner also claims that he was denied operator positions in May 2003 and July 2003 based

upon his race.  The evidence shows that Matt Green received the operator 1 position in May 2003.

Green had less seniority than Turner but had never been disqualified from any operator position.

Robert McGuire was awarded an operator 2 position in July 2003.  Again, the evidence showed that

Turner had more seniority than McGuire but McGuire had never been disqualified from any operator

position.  It is undisputed that ADM did not promote Turner to these positions because he had

previously been disqualified from operator positions.  Turner argues that he was discriminated

against, noting that ADM had earlier awarded him an operator position following his

disqualifications.  Turner notes that he had to leave the position, but this was due to a temporary

medical inability, not work performance.  Turner therefore argues that he was qualified for the

operator positions because ADM "itself had previously found him to be so."  However, Turner

testified at his deposition that, in filling an operator position, management had the right to consider

whether an individual had been previously disqualified from a position.

This court concludes that Turner has not established a prima facie case as to the two operator

positions.  This court agrees with ADM that Turner has not shown that the employees chosen for

the positions, who had never been disqualified from an operator position, were not more qualified

for the positions.

Turner has also argued, at length, that he has shown that ADM's stated reason for its

decisions regarding these promotions is a pretext for discrimination.  However, because Turner has

not established a prima facie case, there is no need to discuss pretext.[12]  See Peele, 288 F.3d at 326.

---

[12]  This court notes that Turner's evidence of pretext is weak.  Turner relies on the fact
that Cox, a white employee, was permitted to move into an operator position after having
previously been disqualified.  However, the evidence shows that, on another occasion, Cox was
denied a position due to his prior disqualifications and also shows that Turner was promoted
twice to operator positions after he had been disqualified.  Based upon this evidence, this court
agrees with ADM that Turner and Cox were essentially treated the same.  This court also notes
that Turner originally claimed that he was discriminated against when Jeremy Young was
selected for an operator 2 position in June 2003.  Young was the second most senior person to
bid on that position and is African American.  Turner has now withdrawn his claim that he was

## B.  RACE DISCRIMINATION -TERMS AND CONDITIONS OF EMPLOYMENT

Several Plaintiffs have claimed that they were subjected to discrimination regarding the terms and conditions of their employment.  To establish a prima facie case of "disparate treatment" discrimination, each of these Plaintiffs must show that he: (1) is a member of a protected class; (2) was performing his job satisfactorily; (3) suffered an adverse employment action; and (4) was treated less favorably than at least one similarly situated employee not in the protected class.  See Farrell v. Butler Univ., 421 F.3d 609, 613 (7th Cir. 2005).  "To show that another employee is 'similarly situated,' a plaintiff must show that there is someone who is comparable to [him] in all material respects."  See Durkin v. City of Chicago, 341 F.3d 606, 613 (7th Cir. 2003), citing Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  Courts must consider all relevant factors to determine whether two employees are similarly situated. Durkin, 341 F.3d at 613, citing Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).

### 1.  OVERTIME

#### a.  MORRIS

At his deposition taken on June 22, 2004, Morris testified that he had received very little overtime "in the last year and a half."  He testified that two employees, Jason Peterson and Corey Little, were given much more overtime.  Morris also testified, however, that Peterson held an operator 1 position, while he was an operator 2, and that Little is African American.  Morris also testified that Kurt Burrell received overtime "whenever he asks for it."  Morris did not specifically testify that Burrell received more overtime than he did but stated "normally when he asks he gets

---

discriminated against when Young was given the position, but the fact that Young, an African American employee, was promoted undercuts Turner's claim that ADM used the fact that he had previously been disqualified for the position as a pretext for discrimination based upon his race.

it." ADM has provided evidence to show that, in 2003, Morris actually received 106 more hours of overtime than Burrell.

Morris argues that, by testifying that Peterson and Burrell received more overtime, he has met his prima facie burden.  Based upon the evidence presented in this case, this court agrees with ADM that Morris has not met his burden of establishing a prima facie case of discrimination. Peterson cannot be considered similarly situated to Morris because he did not hold the same job classification and the evidence shows that Morris actually received more overtime than Burrell. Therefore, the only similarly situated employee who the evidence shows may have been given more overtime than Morris is Little, who is also African American.  Because Little is also in the protected class, Morris has not shown that a similarly situated employee not in the protected class was treated more favorably.  This court concludes that ADM is entitled to summary judgment on this claim.

### b.  TURNER

Turner claims that he was denied overtime based upon his race.  Turner claims that he was qualified to receive the benefit of overtime hours, was denied the benefit of overtime assignments in April 2000 and that white employees did receive this benefit.  Turner bases this claim on a grievance he filed on April 7, 2000, in which he stated that he was not given overtime on two specific dates, April 3 and April 7, 2000, and that Kelm was "singling [him] out" and not assigning overtime fairly.  Turner also argues that ADM conducted a "hopelessly flawed" investigation of the grievance.  However, Turner has not provided any evidence to show that any white employee received  more overtime than he did in April 2000.  Turner has stated, in his declaration attached to his Response to ADM's Motion for Summary Judgment, that Dave True, a white employee, was given overtime on the shifts he discussed in his grievance.  This court agrees with ADM that

55

Turner's evidence falls far short of showing that similarly-situated non-minority employees were given longer or more frequent overtime assignments. This court concludes that Turner's conclusory evidence does not establish a prima facie case of discrimination and that ADM is entitled to summary judgment on this claim.[13]

## 2. INJURY TIME OFF

Morris claims that he was not given adequate time off following an injury based upon his race. Morris testified that, after he injured his foot in 2000, the "company doctor" gave him a note stating that he needed one or two days off work, and he was provided that much time off. Morris testified that he disagreed with the company doctor about the amount of time he needed to be off to allow his foot to heal but could not say that he provided any documentation to ADM stating that he needed additional time off. Morris attached his declaration to his Response to ADM's Motion for Summary Judgment. In his declaration, Morris stated that two white employees, Jason Peterson and Jeffrey Jeffords, suffered burns and were given two weeks and at least 30 days off from work, respectively.

This court concludes that Morris has not presented sufficient evidence to show that he has a prima facie case of discrimination as to injury time off. Morris has not even attempted to show that the injuries suffered by Peterson and Jeffords were similar to the injury he suffered. This court therefore agrees with ADM that Morris has not shown that anyone comparable to him was treated

---

[13] This court notes that Turner has also claimed that he was discriminated against on November 2, 1999, when he was sent home when he said he could not clean coolers because of his medical condition. This court agrees with ADM that Turner did not include this specific claim in anything he filed prior to his Response to ADM's Motion for Summary Judgment. This court further concludes that Turner has not submitted sufficient evidence to support his claim that white employees Kirk Mackling and Roger Shaffer were similarly situated and treated more favorably. Turner cites only to Kelm's deposition testimony in support of this claim. Kelm testified, however, that Turner had not yet submitted documentation regarding his medical restriction at the time he was sent home. Kelm also testified that he did not know the circumstances regarding Mackling and Shaffer because they were both working in a different area.

more favorably and concludes that ADM is entitled to summary judgment on this claim.

### 3. TRAINING

#### a. MANN

Mann testified that he did not receive adequate training for the operator position he received in 2004 and that a white employee, Engdale, was treated more favorably. In his statement of additional facts, Mann set out various facts regarding the operator position and appeared to be claiming that he was denied training based upon his race. However, Mann did not include any specific argument regarding this claim in the argument portion of his brief. In any case, this court agrees with ADM that Mann has not established a prima facie case regarding this claim. The evidence shows that the employee Mann contended was treated more favorably, Engdale, was required to take and pass a test in order to remain in an operator position.

#### b. OWENS

Owens originally claimed that he was denied a promotion to a lysine UF operator position, but changed his claim to a claim that he was denied sufficient training for the position based upon his race. In his Response to ADM's Motion for Summary Judgment, Owens argues that he has met his prima facie burden regarding his denial of training claim. Owens contends that he could not complete the training because he was required to do other tasks and was thereby prevented from qualifying for the position. He also argues that he was "laughed at" when he later asked to be trained on the position. Owens contends that white employees were treated more favorably.

This court agrees with ADM that Owens has not shown that a genuine issue of material fact exists regarding this claim. Owens testified that he did not know if there was a position available when he was training for the lysine UF position. He testified that he could not answer questions

during the training and was told he was not going to make it.  He was therefore not allowed to complete the training.  At his second deposition, Owens testified that he "told them I didn't want to train anymore."  Owens testified that he was not aware of anybody else who could not answer the questions he was asked and could not remember if anyone was qualified for the position if he could not answer the questions.  When asked the basis for his claim that his failure to qualify for the position was based upon his race, Owens stated, "there was only one other black in the control room in that department, and we never got a chance to go up there, so pretty much as soon as I got out of that spot, another guy slid right in."  Owens also testified that he did not remember if there was a position available at the time he did not complete the training and was not aware if anyone was promoted into the position at that time. Owens testified, in general, that "other people in the plant with different supervisors" were given help to answer questions, but admitted that he only saw portions of the tests given to other employees.  Owens testified that, when he later asked to be trained for the position, he did not know if there were openings for the position.  The plant superintendent stated in his affidavit that there was no need to train anyone at that time.

In his declaration submitted with his Response to ADM's Motion for Summary Judgment, Owens stated that, during his training, his supervisor required him to do other jobs so that he would have a hard time qualifying for the position and also stated that he saw a white employee, Scott Jesse, get qualified by answering one simple question.  ADM argues that Owens' declaration contradicts his deposition testimony and should not be considered.

This court has already noted that a "party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony."  See Velez, 442 F.3d at 1049.  In situations where a deposition and

affidavit are contradictory, "the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Velez, 442 F.3d at 1049. In this case, Owens was deposed on two occasions and was given ample opportunity to testify about the basis for all of his claims. During his depositions, he never mentioned Scott Jesse's training, so Defendant had no opportunity to inquire what position Jesse was training for and when this occurred. Owens has not made any attempt to explain the conflict between his clear deposition testimony and his contradictory statements in his later declaration. Accordingly, this court will not consider the statements contained in the declaration. See Velez, 442 F.3d at 1049. This court therefore concludes that Owens has not shown that a similarly situated white employee was treated more favorably regarding training and ADM is entitled to summary judgment on this claim.

### c. ROBINSON

Robinson claims that he was denied training for an operator 1 position in 2005 based on his race. However, he testified that he never asked for training and ADM has thoroughly explained the situation and why it chose Waltrous to cover the temporary position. Based upon the evidence, this court concludes that Robinson has not shown that he was discriminated against because of his race and ADM is entitled to summary judgment on this claim.

### 4. DISCRIMINATORY DISCIPLINE

In order to establish a prima facie case of discriminatory discipline, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees

59

outside the protected class more favorably.  Lucas v. Chicago Transit Auth., 367 F.3d 714, 728 (7th

Cir. 2004).  To the extent that a plaintiff claims that he was subject to disparate punishment, he

"must establish that he received dissimilar-and more harsh-punishment than that received by a

similarly situated employee who was outside the protected class."  Lucas, 367 F.3d at 728.  In

determining whether employees are similarly situated in disciplinary cases, the plaintiff must show

that he or she is similarly situated with respect to performance, qualifications and conduct.  Ezell

v. Potter, 400 F.3d 1041, 1049 (7th Cir. 2005); Peele, 288 F.3d at 330.  "This normally entails a

showing that the two employees dealt with the same supervisor, were subject to the same standards,

and had engaged in similar conduct without such differentiating or mitigating circumstances as

would distinguish their conduct or the employer's treatment of them."  Ezell, 400 F.3d at 1049-50,

quoting Peele, 288 F.3d at 330.

　　　However, the Seventh Circuit has recently emphasized that "the similarly situated inquiry

is a flexible one that considers 'all relevant factors, the number of which depends on the context of

the case.'"  Humphries v. CBOCS West, Inc., ___ F.3d ___, 2007 WL 60876, at *14 (7th Cir. 2007),

quoting Radue, 219 F.3d at 617.  "As to the relevant factors, an employee need not show complete

identity in comparing himself to the better treated employee, but he must show substantial

similarity."  Humphries, 2007 WL 60876, at *14, quoting Radue, 219 F.3d at 618; see also Goodwin

v. Bd. of Trs. of Univ. of Ill., 442 F.3d 611, 619 (7th Cir. 2006).  The "purpose of the similarly

situated requirement is to eliminate confounding variables, such as differing roles, performance

histories, or decision-making personnel, which helps isolate the critical independent variable:

complaints about discrimination."  Humphries, 2007 WL 60876, at *14.  The inquiry simply asks

whether there are sufficient commonalities between the plaintiff and the would-be comparator to

allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination. <u>Humphries</u>, 2007 WL 60876, at *14. This court further notes that the court in <u>Lucas</u> stated that a plaintiff's evidence that African American employees were treated more harshly, without any evidence of the times, dates or places this occurred, is not sufficient, noting that "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." <u>Lucas,</u> 367 F.3d at 726.

### a. ROBINSON

Robinson argues that he has established a prima facie case of discrimination regarding the warning he received in February 2004 when he failed to depressurize the caustic line and caused another employee to suffer burns. Robinson states that he "received a Step 2 level of discipline for this incident, which he testified may subject him to additional and/or more severe discipline in the future." This court first notes that, in fact, it is undisputed that Robinson did not lose any pay or suffer any employment consequences as a result of the warning he received in February 2004. Therefore, there was no tangible job consequence accompanying the reprimand and Robinson has not shown that he suffered an adverse employment action and cannot establish a prima facie case of discrimination. <u>See</u> <u>Lucas</u>, 367 F.3d at 731 ("[o]ur past decisions indicate that a negative evaluation or admonishment by an employer does not rise to the level of an adverse employment act"). This court also agrees with ADM that Robinson did not present any evidence that a similarly situated employee not in the protected class left a machine pressurized causing injury to another employee, and was not disciplined. This court notes that Robinson did testify that someone else got burned by caustic and "to his knowledge" no one received a warning. However, Robinson admitted he did not know all of the facts and circumstances regarding this incident and, apparently, did not

know what employee may have been at fault and subject to discipline.  This unknown employee is, of course, of unknown race and ethnicity.  See Lucas, 367 F.3d at 732.  For the reasons stated, this court concludes that ADM is entitled to summary judgment on Robinson's claim.

b.  GRAY

Gray claims that he was subjected to discriminatory discipline when he was suspended for three days in June 2005 for cursing during a safety meeting.  Gray contends that he has established a prima facie case of discrimination because he has shown that two white employees, Chris Janes and John Larrison, engaged in similar conduct and were not disciplined.  He contends that Janes and Larrison are similarly situated because they both hold operator positions and report to Brad Hunt, the department superintendent.

This court agrees with ADM that Gray has provided no admissible evidence regarding the actual conduct of Janes and Larrison.  Gray testified only that they told him that they "did the exact same thing" and that he heard from others that they were "cussing, yelling, and screaming." However, Gray testified that Janes and Larrison were not present at the safety meeting where Gray's conduct occurred and that he was not present at the safety meeting where Janes' and Larrison's conduct occurred.  Gray also did not know who conducted the safety meeting Janes and Larrison attended.  Gray has provided this court with no facts or details regarding their actual conduct, including the words used, or their disciplinary history.  The evidence shows that, shortly before the June 2005 incident, Gray had received a verbal warning in March 2005 for insubordination based upon his comments to a supervisor.

While this court recognizes that the similarly situated inquiry is a flexible one, this court concludes that Gray has not provided sufficient details for this court to determine whether there are

62

sufficient commonalities between Gray and the would-be comparators, Janes and Larrison.  See Humphries, 2007 WL 60876, at *14.  This court finds particularly significant that no evidence has been provided regarding the actual comments made by Janes and Larrison, and who the comments were directed to, so that their comments can be compared to the comments Gray admitted he made to Hunt, the plant superintendent.  This court therefore concludes that Gray has not established a prima facie case of discrimination and ADM is entitled to summary judgment on this claim.

## c.  TURNER

Turner claims that he was discriminated against when he was disciplined and sent home for being out of his work area in April 2002.  Turner testified that he missed "an hour, an hour and a half" of work on that occasion.  Turner testified that Kelm told him that Kelm had been looking for him for 20 minutes and specifically testified that he was not aware of "any Caucasian employees that Mr. Kelm was unable to find who did not have the same disciplinary action."  Significantly, in his Response to ADM's Statement of Undisputed Material Facts, Turner stated that it was undisputed that "Turner is not aware of any other employee whom Kelm treated differently in a  situation similar to the April 2000 incident." However, in his declaration, attached to his Response to ADM's Motion for Summary Judgment, Turner stated:

> I have knowledge that white individuals were "away from their work areas" for twenty minutes or more without being written up or sent home early.  For instance, white employee Dave Miller often took long smoking breaks of up to half an hour.  White plant superintendent Fred Kelm was aware of this, as was white supervisor Chick Wietros, who often accompanied Miller on these breaks.

63

This court has previously noted that a "party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony." Velez, 442 F.3d at 1049. Therefore, in situations like this where a deposition and affidavit are contradictory, "the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." Velez, 442 F.3d at 1049. Moreover, a court may disregard facts which contradict facts included in a statement of facts which has been admitted. See Koszola, 385 F.3d at 1109. In this case, Turner has made no attempt to explain away his prior deposition testimony and, in fact, conceded that a material fact based upon this testimony was "undisputed." Therefore, his contrary declaration must be disregarded and, based upon the "undisputed" fact that he is not aware of any employee who was treated differently by Kelm in a similar situation, Turner cannot establish a prima facie case of discrimination based upon this disciplinary action. ADM is entitled to summary judgment on this claim.

## C.  HOSTILE ENVIRONMENT

Title VII's prohibition on discrimination also encompasses a prohibition on requiring employees to work in a discriminatory hostile or abusive environment. Velez, 442 F.3d at 1047, citing Harris v. Forklift Systs., Inc., 510 U.S. 17, 21 (1993). In addition, hostile environment harassment is prohibited by § 1981. Flenaugh v. Airborne Express, Inc., 2004 WL 407009, at *10 (N.D. Ill. 2004). In order to survive summary judgment on their hostile work environment claims, each Plaintiff must establish that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive enough to alter the conditions of

64

his environment and create a hostile and abusive working environment; and (4) there is a basis for employer liability.  See Velez, 442 F.3d at 1047.  Harassing conduct does not need to be both severe and pervasive.  Jackson v. County of Racine, ___ F.3d ___, 2007 WL 174681, at *5 (7th Cir. 2007), citing Cerros v. Steel Techs., Inc., 398 F.3d 944, 950 (7th Cir. 2005).  However, harassment must be objectively and subjectively hostile; a plaintiff must show that a reasonable person would find the harassment hostile or abusive, and that he himself found it to be so.  Gentry v. Export Pkg. Co., 238 F.3d 842, 850 (7th Cir. 2001), citing Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Flenaugh, 2004 WL 407009, at *10.  To determine when a workplace becomes objectively hostile, a court considers a series of factors: "the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work."  Valentine v. City of Chicago, 452 F.3d 670, 681 (7th Cir. 2006).  "[A]n objectively hostile work environment will not be found where '[m]ost of the conduct that forms the basis of [a plaintiff's] claim consists of derogatory statements made by supervisors or co-workers out of [his] hearing,'" when the other conduct is "isolated and not particularly severe."  Whittaker v. N. Ill. Univ., 424 F.3d 640, 645 (7th Cir. 2005), cert. denied, 126 S. Ct. 2986 (2006), quoting Mannie v. Potter, 394 F.3d 977, 983 (7th Cir. 2005).  The Seventh Circuit has recently stated that the question this court should focus on is "whether a protected group is experiencing abuse in the workplace, on account of their protected characteristic, to the detriment of their job performance or advancement."  Jackson, 2007 WL 174681, at *6.

An employer is liable for a hostile work environment claim if the plaintiff's supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was "negligent either in discovering or remedying the harassment."  Velez, 442 F.3d

65

at 1047.  In this context, a "supervisor" is "someone with the power to <u>directly</u> affect the terms and conditions of the plaintiff's employment.  <u>Rhodes v. Ill. Dept. of Transp.</u>, 359 F.3d 498, 506 (7th Cir. 2004) (emphasis in original).  An employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor.  <u>Rhodes</u>, 359 F.3d at 506.  As far as co-worker harassment, the employer will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures once apprised of the harassment.  <u>Rhodes</u>, 359 F.3d at 506.  "Generally, [courts] do not consider an employer to be apprised of the harassment 'unless the employee makes a concerted effort <u>to inform the employer that a problem exists</u>.'"  <u>Rhodes</u>, 359 F.3d at 506-07 (emphasis added), <u>quoting</u> <u>Silk v. City of Chicago</u>, 194 F.3d 788, 807 (7th Cir. 1999).

This court concludes that, taken as a whole, the events identified by Plaintiffs do not show that Plaintiffs were experiencing abuse in the workplace, on account of their race, to the detriment of their job performance or advancement.  <u>See</u> <u>Jackson</u>, 2007 WL 174681, at *6.  Therefore, this court concludes that Plaintiffs have not shown that the workplace was objectively hostile.  This court further concludes that Plaintiffs have not shown that the incidents complained of were subjectively hostile.  This court notes that some of the Plaintiffs testified that the alleged harassment did not interfere with their ability to do their work.[14]  Moreover, much of the conduct relied upon was never reported to management at ADM.  This failure to complain is strong evidence that Plaintiffs did not subjectively perceive the environment to be hostile.  <u>See</u> <u>Flenaugh</u>, 2004 WL 407009, at *10.  It also means that ADM cannot be liable for co-worker harassment it did not know about.  <u>See</u> <u>Rhodes</u>, 359 F.3d at 506-07.  In addition, the evidence shows that, as far as conduct that was reported, ADM took steps to remedy the conduct that was reasonably calculated to prevent further harassment and,

---

[14]  Their efforts to contradict this testimony by submitting contradictory declarations are, as noted previously, ineffectual.

66

therefore, cannot be liable for that conduct.  See Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 976-77 (7th Cir. 2004); see also Jackson, 2007 WL 174681, at *7 (no trier of fact could find that the defendant did not act reasonably to correct the harassing behavior that was brought to its attention). For example, this court specifically notes that Gray testified that ADM management was responsive to his complaints when he reported that two coworkers referred to him as "boy."  This court additionally notes that the evidence showed that Peck was fired when ADM's investigation showed that he was responsible for writing racist graffiti.  Further, the evidence showed that ADM responded to the presence of graffiti and either removed it or covered it up and made efforts to prevent its reoccurrence.

In addition, this court notes that many of the Plaintiffs' complaints concern graffiti not personally directed at them and incidents that they did not even witness but were only told about. Offensive conduct that is not directed at the plaintiff, such as generalized graffiti or statements that are merely overheard or heard about second-hand, fails to create an actionable hostile environment. See Smith v. Ne. Ill. Univ., 388 F.3d 559, 566-67 (7th Cir. 2004) (Seventh Circuit held that coworker's use of terms "motherfucking niggers" and "black motherfuckers" did not create actionable hostile work environment where the harassment was not directed at the plaintiff); Woodard v. Tower Auto. Prods. Co., 2004 WL 2203394, at *2 (N.D. Ill. 2004) (incidents of racial graffiti, while disturbing and offensive, not actionable where directed at a general audience rather than at the plaintiff); cf. Cerros, 398 F.3d at 948 (evidence showed that the graffiti was directed at the plaintiff).

This court also notes that harassment is not actionable unless it is shown to be based upon the plaintiff's membership in a protected class, in this case, based upon race.  See Velez, 442 F.3d

at 1047.  In this case, some of the conduct Plaintiffs have complained about has not been shown to have anything to do with race and cannot be considered actionable harassment based upon race.  For example, there is no evidence that the problems Freeman and Robinson testified that they had with their supervisor Felton had anything to do with race.  Moreover, they testified that any problems they had with Felton ended in July 2002 when Roger Edgecombe replaced Felton as their supervisor. This court reaches the same conclusion regarding the problems Mann testified that he had with Smith, his African American supervisor, and Blankenship, as well as the problems Morris testified that he had with Wells.  There is simply no evidence to show that any of these problems were based upon race.  In addition, this court concludes that Morris clearly failed to show that his problems with Bailey were based upon his race.  The evidence showed that Bailey was an equal opportunity harasser who was eventually terminated because of his treatment of ADM employees, both African American and white.  Furthermore, while Mann presented evidence that ADM supervisor Dennis Miller told Brian Van Scyoc to stop "hanging around" with Mann, Mann provided no evidence that this was based upon Mann's race rather than Mann's admittedly lengthy disciplinary record.

This court also concludes that Turner has not shown that the term "Bubba" was racially derogatory.  Turner testified for the first time regarding the use of this term at his deposition in 2006 and stated that he was called "Bubba" by three supervisors, one of whom is African American. Turner has cited to an article regarding a British soldier who obtained an award of damages for racial harassment, based in part on the fact that he was referred to as "Bubba."  However, the article stated that the soldier had also been called "nigger," "fat," and "hairy."  ADM has pointed out that the nickname "Bubba" is not generally understood as an anti-African American slur, citing Taylor v. Commonwealth, 177 F. Supp. 2d 497, 502 (E.D. Va. 2001), and York v. Mobil Oil Corp., 1991 WL

68

53337, at *2 (N.D.N.Y. 1991).  In <u>Taylor</u>, the district court determined that "Bubba" was not a racially derogatory term and, in <u>York</u>, the district court found there was no evidence that the use of the nickname "Bubba" showed racial animus.  In its Reply Brief, ADM has pointed out that "Bubba" is the widely used nickname of NFL great and actor Bubba Smith and was a common nickname of former President William J. Clinton.  Based upon the evidence in this case and the authority cited by ADM, this court concludes that Turner has completely failed to show that he was called "Bubba" based upon his race and that the use of this term amounted to harassment based upon race.  This court also concludes that Morris failed to show that the use of the term "college boy," which he testified stopped after he complained, amounted to harassment based upon race.  In addition, this court concludes that Owens' testimony that he believed that Rocky Daniels' actions were based on race because he saw confederate flag seat covers in Daniels' truck is not sufficient to show harassment based upon race.  <u>See</u> <u>Flenaugh</u>, 2004 WL 407009, at *10 (district court determined that display of a confederate flag tattoo was not sufficient to show an objectively hostile or abusive environment).

As far as the claims by some of the Plaintiffs that they were subjected to discriminatory discipline which contributed to the hostile environment, this court concludes that Plaintiffs have not shown that they were subjected to discriminatory discipline based upon their race.  While many of the Plaintiffs, including Joyner, testified that they were disciplined when white employees were not, they were not able to provide evidence which showed that white employees who engaged in the same or similar conduct under the same or similar circumstances were not subjected to discipline.  This court notes that Gray submitted lengthy documentation in support of his claims that he was harassed by being subjected to discriminatory discipline.  After careful consideration of this

evidence, this court concludes that Gray has not shown that he was disciplined more severely because of his race. His claims must fail because he conceded that he did make the mistakes for which he was disciplined and because he does not have sufficient evidence regarding the conduct of other employees for this court to determine whether the conduct was actually comparable to Gray's conduct. Gray admitted that he did not know the circumstances of many of the incidents and also admitted that he did not know if ADM management was aware of some of the incidents where other employees made mistakes and were not disciplined. A plaintiff must establish that the employer had knowledge of misconduct committed by similarly situated employees because the employer cannot exercise discipline if it does not know of the misconduct. See Flenaugh, 2004 WL 407009, at *10.

Mann also claimed that he was subjected to discriminatory discipline which contributed to the hostile work environment, pointing to his eleven-day suspension. However, Mann admitted making comments to a female employee and admitted that the conversation lasted approximately 15 minutes when he was "on the clock" and supposed to be working. Mann also does not dispute that he had a significant disciplinary history at ADM. This court concludes that Mann has not shown that any other employee who engaged in substantially similar conduct, and had a substantially similar disciplinary record, was treated more favorably. Therefore, Mann did not show that this incident amounted to harassment based upon his race.

As far as White's claim that he was subjected to a hostile work environment, this court agrees with ADM that White can have no claim regarding any incidents that occurred prior to March 21,

2002, the date he executed a release of all claims against ADM. This court further agrees with ADM

70

that White failed to provide this court with any evidence, other than his own beliefs and speculation, that the incidents he relies upon were based upon his race.  The Seventh Circuit has recently noted that "if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed."  Mlynczak v. Bodman, 442 F.3d 1050, 1058 (7th Cir. 2006).

This court concludes that the case heavily relied upon by Plaintiffs, Nelson v. Foster Wheeler Constructors, Inc., 1998 WL 792474 (N.D. Ill. 1998), is persuasive authority only and is clearly distinguishable from the facts here.  In Nelson, the district court concluded that the plaintiff provided sufficient evidence to create a question of fact as to whether he was subjected to a racially hostile environment and denied the defendant's motion for summary judgment.  In that case, the plaintiff testified that a number of incidents occurred during the eight months he worked for the defendant. Nelson, 1998 WL 792474, at *1.  Specifically, the plaintiff testified that he saw a noose hanging from a banister every day for about two weeks until it was taken down.  Nelson, 1998 WL 792474, at *2.  The plaintiff testified that he saw several foremen and a superintendent look at the noose during this two week period without removing it.  Nelson, 1998 WL 792474, at *2.  The plaintiff also testified that he saw racial and sexual graffiti in the portable toilets at the worksite.  Nelson, 1998 WL 792474, at *2.   The plaintiff testified that he saw another employee show the superintendent the graffiti several months before it was removed and testified that he got so fed up with it that he took photographs of the graffiti.  Nelson, 1998 WL 792474, at *2.  The district court in Nelson stated that the "photographs depict graphic and offensive racial and sexual graffiti." Nelson, 1998 WL 792474, at *2.  The plaintiff also testified that a white co-worker referred to him as "nigger" in the presence of a third co-worker and that another white co-worker told him that it

71

he wanted an overtime job, he would have "to get some of the shoe polish off [his] face." Nelson, 1998 WL 792474, at *2. The plaintiff also testified that he was unfairly criticized for being three minutes late, when a white co-worker who was much later was not reprimanded. Nelson, 1998 WL 792474, at *2. The plaintiff in Nelson admitted that he never formally reported any of the alleged incidents to any supervisors, except for a comment about the graffiti. Nelson, 1998 WL 792474, at *2. As noted, the district court held that the plaintiff had presented sufficient evidence to raise a genuine issue of fact and preclude summary judgment. The district court specifically found that the plaintiff's failure to report "the open and obvious conduct" was not fatal to his claims. Nelson, 1998 WL 792474, at *6.

Plaintiffs in this case have each provided evidence of incidents which occurred over the course of many years. As noted previously, many of the incidents relied upon were not directed at any of the Plaintiffs. This court concludes that none of the Plaintiffs have presented evidence of harassment similar in nature or degree to the incidents which occurred over the course of only eight months to the plaintiff in Nelson. This court notes that Robinson testified that he found a rope "tied in a loop," which he described as a noose, sometime between 1998 to 2000 and that, in 2004 or 2005, he heard that another employee found a rope on his lunch box. Contrary to Plaintiffs' arguments, these incidents were not similar to the evidence in Nelson that a noose hung on a banister for about two weeks even though several foremen and the superintendent saw it during that time. This court also notes that, following the decision in Nelson, more recent case law clearly establishes that Plaintiffs must take advantage of an employer's anti-harassment policies and report the harassment in order to have a viable cause of action. See Jackson, 2007 WL 174681, at *7.

After careful consideration, this court concludes that none of the Plaintiffs have established

72

a genuine issue of material fact regarding whether the harassment he suffered was severe or pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment.  See Velez, 442 F.3d at 1047.  In making this determination, this court has carefully considered "the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work."  See Valentine, 452 F.3d at 681.

After careful consideration of all of the evidence presented regarding Plaintiffs' hostile environment claims, this court concludes that ADM is entitled to summary judgment as to these claims.

IT IS THEREFORE ORDERED THAT:

(1) ADM's Motions for Summary Judgment (#86, #88, #90, #92, #94, #96, #98, #100, #102) are GRANTED.  Judgment is entered in favor of ADM and against Plaintiffs.

(2) This case is terminated.

ENTERED this 2nd day of February, 2007.


s/MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

73